**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Scott SOPHIE, et al., Defendants–Appellants.**

**Nos. 87–2394, 87–2395, 87–2412 to 87–2414, 87–2425 and 87–2459.**

United States Court of Appeals, Seventh Circuit.

Argued April 13, 1989.

Decided April 24, 1990.

Anton R. Valukas, U.S. Atty., Caryn Jacobs, David J. Stetler, James R. Ferguson, and Victoria J. Peters, Asst. U.S. Attys., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff.

Allan A. Ackerman, Robert S. Bailey, Giles Franklin, Richard C. Gleason, Chicago, Ill., and Melvyn Kessler, Miami, Fla., for defendants.

Before WOOD, Jr., COFFEY and MANION, Circuit Judges.

MANION, Circuit Judge.

Scott Sophie, Miguel Muelle, Humberto Duque, Jorge Carricaburu, Alan Pollak, Henry Laskowski, Arthur Campos, and Ophelia Velasquez appeal their convictions on various drug-related charges. We affirm.

## I.

This case stems from an indictment charging the appellants and several other defendants with conspiring to distribute cocaine in the Chicago area from 1979 until April 1986. The indictment also charged several defendants, including Campos, Velasquez, and Pollak, with several counts alleging conduct that occurred after the conspiracy ended. To begin, we will briefly set out an overview of the conspiracy, the post-conspiracy acts, and the proceedings in the district court. We will discuss other facts in greater detail when required to analyze the issues raised in this appeal.

The conspiracy revolved around Charles Petersen and Gary Raffanti, who in 1979 formed a partnership to distribute cocaine. Petersen and Raffanti were cocaine wholesalers: they would buy cocaine from suppliers, dilute it, break it down into smaller quantities, and sell it to retail dealers. One of Petersen's and Raffanti's early suppliers was Campos. During 1980 and 1981, Petersen and Raffanti bought kilograms of cocaine from Campos. Petersen and Raffanti stopped buying cocaine from Campos in 1982, having found less expensive sources. Campos, however, did not leave the picture; instead, Campos began buying cocaine from Petersen and Raffanti during 1983, 1984, and 1985. Campos did not personally handle these transactions because he had moved to California. Campos' contact with the partnership was Velasquez, his sister, who lived in Chicago.

Petersen's and Raffanti's first cocaine supplier was John Sidorowicz. Through Sidorowicz, Petersen and Raffanti met Sophie and Muelle, who had been Sidorowicz's suppliers. In May 1982, Petersen and Raffanti first purchased two kilograms of cocaine from Sophie. In 1983, 1984, and 1985, Petersen and Raffanti regularly bought large amounts (about seven to ten kilograms per month on average) of cocaine from Sophie and Muelle.

On several occasions, Petersen and Raffanti met with Sophie and Muelle in Florida and discussed cocaine deals. However, Sophie would typically deal with Petersen and Raffanti in Chicago, while Muelle remained in Florida. Sophie employed several people to drive cocaine to Chicago. Sophie, who would travel to Chicago separately, would pick up the cocaine from the driver. Raffanti would meet Sophie in Sophie's hotel room, test the cocaine, and inform Petersen that the cocaine was satisfactory by paging Petersen's electronic pager. Petersen would then withdraw money from a safe deposit box, take it to Sophie, pay for the cocaine, and deposit the cocaine in another safe deposit box.

In July or August 1985, Petersen and Raffanti had a dispute with Sophie and Muelle over payment for a cocaine shipment. Sophie and Muelle demanded $10,000 more than Petersen and Raffanti thought they should have had to pay for that purchase. Although Petersen and Raffanti tried to work out the dispute with Muelle, they eventually paid the additional $10,000. Because of the dispute, Petersen and Raffanti stopped buying cocaine from Sophie and Muelle.

Besides Campos and Velasquez, Petersen and Raffanti sold to several other dealers. Among those dealers were Laskowski and Pollak. Pollak began buying cocaine from Petersen and Raffanti in 1980, and continued buying cocaine from the partnership in 1986. Laskowski had been introduced to Petersen and Raffanti in late 1980 as a potential supplier, and first discussed buying cocaine from the partnership shortly after those discussions. He continued buying cocaine from the partnership at least until November 1985.

Around April 1985, Michael Gorny, who had been a supplier and driver for Petersen and Raffanti, became a full partner in their cocaine distribution operation. Petersen, Raffanti, and Gorny rented an apartment in Chicago where they broke down and repackaged cocaine. Petersen and Raffanti also added Gorny's name to the bank safe deposit boxes the partnership used to store cocaine. Gorny's primary responsibility in the partnership was to relieve Petersen from actually conducting cocaine transactions with the partnership's suppliers and dealers. Gorny dealt with many of the same distributors Petersen and Raffanti had dealt with, including Campos, Velasquez, Laskowski, and Pollak, as well as with suppliers and customers he brought into the partnership.

Among the suppliers Gorny dealt with were Duque and Carricaburu. From October 1985 until April 1986, Gorny bought cocaine for the partnership from Duque and Carricaburu. George Bell, whom Gorny had met in Florida in September 1985, delivered the cocaine from Florida to Chicago.

Gorny last attempted to purchase cocaine from Duque and Carricaburu on April 8, 1986. This attempted purchase closed the

curtain on the conspiracy. Federal agents had arrested Petersen and Raffanti in February. Unbeknownst to the other conspiracy members, Petersen began to cooperate with the government. As part of that cooperation, Petersen set up a meeting between Gorny and DEA undercover agent Robert Fanter in Chicago on April 5. At the meeting, Fanter agreed to buy five kilograms of cocaine. Gorny and Fanter arranged for the transaction to take place at Woodfield Mall in Schaumburg, Illinois. On April 8, Bell went to a hotel room and obtained the cocaine from Duque and Carricaburu. Bell then went to Woodfield Mall to deliver the cocaine to Fanter. Bell placed the cocaine in a locker and gave Gorny the key. Gorny in turn gave Fanter that key and Fanter gave Gorny a key to a locker in which Fanter had placed $15,000. Fanter removed the cocaine from the locker in which Bell had placed it, tested it, and gave other agents a signal to arrest Bell and Gorny. A short while later, agents arrested Duque, Carricaburu, and another man (apparently, the man who had driven the cocaine to Chicago) in the hotel room from which Bell had picked up the cocaine.

With Gorny's arrest the conspiracy ended, as Gorny was the last of the three partnership members arrested. However, the April 8 arrests were not the only arrests resulting from Petersen's cooperation. In taped telephone conversations, Petersen arranged a cocaine deal with Pollak in which George Katsenes, Pollak's courier, was to buy one kilogram of cocaine from Fanter, who was to act as Petersen's courier. On April 15, 1986, the deal went on as planned; on Fanter's signal, other agents observing the transaction arrested Katsenes.

Petersen also conducted a series of taped phone conversations with Campos and Velasquez in April, May and June 1985 in which Petersen discussed prior cocaine deals with Campos, and discussed possible future deals with Campos and Velasquez. On July 3, 1986, Velasquez gave Petersen a two-gram sample of cocaine. Petersen and Velasquez then made arrangements, in a recorded phone call, for Petersen to buy a kilogram of cocaine for $29,000. On July 8, Petersen met Velasquez and bought the kilogram. Government agents then arrested Velasquez. Later that day, in a recorded phone conversation, Petersen told Campos that the deal had taken place; Campos replied, "Beautiful."

A grand jury eventually returned a twenty-eight count indictment against Gorny, Bell, Duque, Carricaburu, Sophie, Muelle, Pollak, Katsenes, Laskowski, Campos, and Velasquez, along with William "Billy" Bucholtz, Anthony Bonafede, and Frances Schimmerling (three others who bought cocaine from Petersen). Gorny, Bell, Katsenes, Bucholtz, and Schimmerling pleaded guilty and did not stand trial; Bonafede died before trial, and the district court dismissed the charges against him. As to the remaining defendants, the indictment charged as follows: Count One charged a conspiracy to violate various narcotics laws involving all the remaining defendants. Count Two charged Muelle with conducting a Continuing Criminal Enterprise (CCE) from around July 1983 to around August 1984. Count Three charged Sophie with conducting a CCE during the same time span. Count Five charged Duque and Carricaburu (along with Bell and Gorny) with traveling from Florida to Chicago to distribute cocaine in April 1986. Counts Six, Seven and Eight charged Laskowski with possessing cocaine with the intent to distribute it in September, October, and November 1985. Count Nine charged Duque and Carricaburu (along with Bell and Gorny) of distributing cocaine on April 8, 1986. Count Fifteen charged Duque and Carricaburu (along with Gorny) of using the telephone to facilitate a narcotics offense. The remaining counts were all based on conduct by Campos, Velasquez, and Pollak occurring after the conspiracy ended. Count Ten charged Pollak with attempting to possess cocaine with the intent to distribute it on April 15, 1986. Counts Thirteen and Fourteen charged Campos and Velasquez with distributing cocaine on July 3 and July 8, 1986. Counts Sixteen, Eighteen, Twenty-five, Twenty-six (a count the government dismissed at trial), Twenty-seven, and Twenty-eight charged Pollak, Campos, and

Velasquez with using the telephone to facilitate narcotics law violations.

Petersen and Raffanti, who had pleaded guilty to charges in a separate indictment, were the government's star witnesses at trial. Their testimony was not the only evidence against the defendants, however: the government also introduced numerous exhibits, including taped telephone conversations, phone and electronic pager records, Petersen's partnership records, and testimony from other witnesses, including Bell, Fanter, and several of the drivers who worked for Sophie. The jury, for the most part, found the government's case convincing: it convicted all defendants of all counts charged except for Laskowski, whom it acquitted on Counts Six and Eight (the September and November 1985 possession charges).

On appeal, all the appellants contend that it was improper to join them in the same indictment under Fed.R.Crim.P. 8(b) because it was improper to join counts occurring during the conspiracy with counts that occurred after the conspiracy. Duque raises the related issue of severance under Fed.R.Crim.P. 14. Pollak, Laskowski, Muelle, Duque, and Carricaburu also raise a plethora of other alleged errors. We will discuss these other alleged errors before discussing the joinder and severance issues.

## II.

### A. Pollak's Alleged Plea Agreement

Pollak contends the district court erred by not enforcing an alleged plea agreement between him and the government, or, at least, holding an evidentiary hearing to determine whether the alleged agreement existed. Before trial, Pollak moved the district court to enforce the alleged plea agreement, or alternatively, to hold an evidentiary hearing. The district court did not grant the motion. Pollak filed a similar motion after trial, adding the claim that the government deprived him of counsel of his choice by reneging on the agreement. The district court denied this motion.

According to Pollak, in April 1987, shortly after his arrest, he had what he termed a "casual" meeting with the Assistant United States Attorney (AUSA) in charge of his case. Pollak's attorney was present at that meeting. At that meeting, the AUSA allegedly told Pollak that "if [Pollak] did not cooperate, he was looking at 10 years." Pollak asked his attorney whether he could trust the AUSA; his counsel told him the AUSA was "a man of his word." Based on what happened at the first meeting, Pollak agreed to cooperate with the government.

Pollak met twice with the AUSA and other government agents in the following three to four weeks and gave them information about himself and others. At one of those meetings, a Customs agent told Pollak that if he withheld information, "he [was] looking at five years." Pollak says that he took the AUSA's and agent's statements together to mean that if he cooperated with the government, the government would recommend a sentence less than five years. Pollak cooperated; but after the AUSA checked with his superiors, he told Pollak the government could not recommend less than a 10-year sentence if Pollak pleaded guilty. This proposed recommendation, which Pollak considered to be a breach of his agreement with the government, caused him to lose faith in his attorney who had told him he could trust the AUSA. Because of this lost faith, Pollak fired his attorney and went to trial with a new attorney.

Pollak asserts that in exchange for his cooperation, the government promised that it would not use any statements he made against him (the "immunity agreement") and that if he pleaded guilty, the government would recommend a sentence less than five years (the "sentence agreement"). (As do the parties, we shall refer to these alleged agreements together as the "plea agreement.") Pollak asserts that the government violated the fifth amendment's due process and self-incrimination clauses by reneging on the plea agreement and using his "immunized" statements against him. Pollak also asserts that the government violated his sixth amendment right to counsel of his choice by causing

him to lose faith in, and subsequently fire, his original attorney. Pollak suggests the proper remedies for the government's alleged underhandedness would be specific performance of the plea agreement (i.e., a reduction of his seven-year sentence to less than five years), or possibly dismissal of the charges against him.

We need not examine the legal bases for Pollak's claims or his proposed remedies. Pollak's claims all rest on the common factual premise that in exchange for his cooperation, the government agreed it would not use his statements against him and that it would recommend a sentence less than five years if he pleaded guilty. Without hearing evidence, the district court concluded there was no agreement; therefore, Pollak's claims failed. Pollak contends that at the very least the district court should have held an evidentiary hearing to determine if any agreements existed and if the government violated them. We disagree.

A district court does not have to hold an evidentiary hearing on a motion just because a party asks for one. An evidentiary hearing is necessary only if the party requesting the hearing raises a significant, disputed factual issue. See *United States v. Fountain,* 777 F.2d 351, 358 (7th Cir.1985). The question in this case is whether Pollak's submissions to the district court were adequate to raise a disputed factual issue that was necessary to decide his motion; if not, no evidentiary hearing was necessary.

Pollak had to show that he and the government had made a plea agreement. Pollak's submissions to the district court, however, fatally undercut his position. Along with his pretrial motion, which included an affidavit from his original attorney, Pollak included a letter he had written to his attorney. In that letter, Pollak admitted that at their first meeting, the AUSA told him, "In exchange for your complete candor ... *I'll see what we can do.* ..." (Emphasis added.) Similarly, Pollak's letter stated that at the second meeting the AUSA told him, *"I cannot promise anything to you* but I'll see what can be done in light of your cooperation and candor, *but I cannot promise you, of course."* (Emphasis added.) [1]

The statements in Pollak's letter indicate that he did not actually receive any promises from the government (and that he probably did not believe there were any promises). More importantly, even if Pollak did believe the government had made promises, the statements in his letter show that any such belief was not reasonable. Plea agreements—and, logically, the sentence and immunity agreements that make up the alleged plea agreement in this case—are contracts, see *United States v. Ataya,* 864 F.2d 1324, 1329 (7th Cir.1988), and determining the existence and meaning of such contracts is governed by ordinary contract principles of offer and acceptance, *United States v. Delegal,* 678 F.2d 47, 50 (7th Cir.1982). Those principles in turn require that we examine the parties' reasonable expectations—an objective standard. *United States v. Fields,* 766 F.2d 1161, 1168 (7th Cir.1985).

Pollak cannot plausibly argue that he reasonably thought the AUSA's and Customs agent's general references to sentence length (i.e., ten or five years without cooperation) represented specific promises to recommend a certain sentence, given the statements in his own letter. Nor can he reasonably argue that the AUSA promised him immunity; in fact, aside from his bald assertion of such a promise, Pollak presented nothing to the district court from which the court could have inferred such a promise. Moreover, given the statements in Pollak's letter, Pollak could not reasonably believe that the AUSA or the agent had the authority to make any specific promise. Despite what might have been Pollak's subjective belief, Pollak's submission to the district court, judged objectively, leads to only one conclusion: no agreement existed.

Besides undercutting his own position, Pollak's letter to his attorney also supports

1. Although Pollak included the motion and affidavit in his appendix on appeal, he did not include the letter. We trust this was an oversight, not an attempt to mislead this court.

the AUSA's account of his meetings with Pollak. While the district court did not hold an evidentiary hearing on the plea agreement issue, the court did hear the parties' positions before trial. At that hearing, the AUSA stated that he had discussed a possible agreement with Pollak but that he and Pollak had not reached any agreement. The reference to ten years related to the possibility of a CCE charge against Pollak: if Pollak did not cooperate, he could face a CCE charge and minimum 10-year sentence. According to the AUSA, it was his standard procedure to tell a defendant about what charges and possible sentence the defendant might be facing without cooperation, and to tell the defendant that with cooperation he would see what he could do.

Given that Pollak's submission undermined his own position and supported the AUSA's version of events; it was proper for the district court to conclude there were no important disputed facts and that no evidentiary hearing was necessary. It was also proper to conclude that no plea agreement existed. Without the agreement, Pollak's fifth amendment claims fail; the government could not breach an agreement that did not exist. Pollak's sixth amendment claim also fails. If the government breached no agreement, Pollak could not impute to the government his loss of faith in, and his decision to fire, his attorney. Pollak very well may have had his hopes dashed, and may have blamed that on his attorney, but that was a matter strictly between him and the attorney.

B. Suppression of Statements by Laskowski

Laskowski contends the district court erred by denying his motion to suppress statements he made after an allegedly illegal arrest. On November 19, 1985, DEA agents, after observing a brief meeting between Laskowski and Petersen in a restaurant parking lot, arrested Laskowski. At that time, Laskowski told the agents that he had just paid Petersen for cocaine. Laskowski also told the agents that he had been buying half kilograms of cocaine from Petersen. Before trial, Laskowski moved to suppress his statements because they were the fruit of an illegal arrest. According to Laskowski, the agents had no probable cause to arrest him. After an evidentiary hearing, at which the agents testified, the district court denied the motion.

In reviewing a district court's decision on a motion to suppress evidence, we take the district court's factual findings as true unless they are clearly erroneous. However, we review de novo the district court's finding that probable cause existed. *United States v. Lima,* 819 F.2d 687, 688 (7th Cir.1987). The district court found that on November 19 the DEA was investigating Petersen, whom agents knew to be a drug dealer. DEA agents Robert Fanter and Dale Knittel were conducting surveillance of Petersen at a restaurant in a Chicago suburb as part of that investigation. The agents saw Petersen receive two telephone calls inside the restaurant and make two calls. They also saw Petersen receive a message on his electronic pager and then make a third phone call. Shortly after that, Laskowski arrived at the restaurant in a gold Nissan 300ZX sports car. Petersen left the restaurant carrying a yellow tote bag and got into the passenger side of Laskowski's car. Fanter saw Petersen pass the tote bag to Laskowski, and saw Laskowski pass the bag back to Petersen. Petersen then exited Laskowski's car about 30 seconds after he had entered it, got into his own car, and drove away.

Knittel, on Fanter's instruction, followed the Nissan. Laskowski was driving rather fast, and Knittel was having trouble keeping up. Knittel activated his siren and rotating lights and, after driving about three more blocks (during which time Knittel had to run stop signs to keep up) pulled Laskowski over. Laskowski got out of the car and Knittel patted him down. Fanter then arrived at the scene and read Laskowski his rights, and Laskowski admitted his cocaine purchases to the agents.

Both Laskowski and the government characterize his stop and detention as an arrest, so we will also. Laskowski contends that the agents had no probable

cause to arrest him. We disagree. Knittel and Fanter had seen Petersen make and receive several phone calls and receive a beeper page. The agents knew that Petersen was a drug dealer; that was why they were watching him. The agents saw Petersen meet with Laskowski for about 30 seconds. During this brief meeting, Petersen and Laskowski passed a yellow tote bag back and forth. It is ludicrous to suggest that these facts were not sufficient for Fanter and Knittel to make "a practical, common sense decision" that a "fair probability" existed that some kind of a drug deal had just taken place between Petersen and Laskowski. See *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Fanter and Knittel thus had probable cause to arrest Laskowski.

Laskowski also quibbles about certain of the district court's factual findings. None of these challenges has any merit. Laskowski complains particularly about the court's finding that Fanter saw Petersen and Laskowski pass the yellow tote bag back and forth. According to Laskowski, it was "inherently improbable" that Fanter could have observed what went on in the Nissan because Fanter was one-quarter to one-half block from the Nissan when he saw Petersen and Laskowski meet. We take it that Laskowski means that Fanter's testimony was inherently unbelievable in the sense that it was impossible for him to have seen what he said he saw. It was not. There is nothing about Fanter's testimony that contradicts the laws of nature or any other unquestionably true evidence, or that confounds logic. See *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989); *United States v. Muskovsky,* 863 F.2d 1319, 1323–24 (7th Cir.1988). It was not unreasonable to believe Fanter, especially given that he was a trained DEA agent, observing what he suspected to be a drug deal. It is likely in that situation that Fanter would have been more observant and concentrating harder than the average person, and thus be able to see things the average person might not. The district court properly denied Laskowski's motion to suppress.

C. Evidentiary Errors

*1. Admission of statement about Laskowski's prior marijuana dealing.*

Petersen testified that in late 1980, Teddy Graves, a co-conspirator who sold marijuana and cocaine to Petersen and Raffanti, set up a meeting between Petersen, Raffanti, and Laskowski. Laskowski had a kilogram of cocaine to sell. Petersen had never met Laskowski, and was somewhat apprehensive about dealing with a new source. In an effort to reassure Petersen, Graves told him that he could trust Laskowski because Laskowski was Graves' "million dollar marijuana customer."

Laskowski contends that the district court abused its discretion in allowing this testimony at trial. Laskowski argues that the statement was hearsay, and not admissible under any exception to the hearsay rule. The government counters that the testimony was admissible under Fed.R. Evid. 801(d)(2)(E). Rule 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay.

Laskowski posits two reasons why Petersen's testimony about Laskowski's marijuana dealing was not admissible under Rule 801(d)(2)(E). First, Laskowski argues that the statement was not "in furtherance of" the conspiracy. (Laskowski does not argue that Graves was not a member of the conspiracy.) The district court, however, did not abuse its discretion in finding Graves made the statement to further the conspiracy. Graves was introducing Laskowski to Petersen and Raffanti as a potential source of cocaine for the partnership. Petersen needed assurance that he could trust Laskowski. Graves' statement about Laskowski's marijuana dealing was meant to provide that assurance, so that Laskowski could deal with the partnership. Although Petersen and Raffanti did not buy cocaine from Laskowski at the initial meeting, they did, beginning a little more than a year later, deal with Laskowski as a buyer. By reassuring Petersen that Laskowski was a source Petersen could trust, and thus help-

ing to facilitate Laskowski's dealings with Petersen and Raffanti, Graves was furthering the conspiracy. Cf. *United States v. Rahme,* 813 F.2d 31, 35–36 (2d Cir.1987) ("statements between conspirators which provide reassurance, [or] serve to maintain trust ... further the ends of the conspiracy"); *United States v. McGuire,* 608 F.2d 1028, 1032–33 (5th Cir.1979) ("puffing" by drug dealers about their source's reliability to obtain a potential customer's confidence furthered conspiracy).

Laskowski also argues that Graves' statement was not admissible under Rule 801(d)(2)(E) because Laskowski was not yet a member of the conspiracy when Graves made the statement. That is irrelevant. Laskowski does not challenge the sufficiency of the evidence to convict him of conspiracy, and thus implicitly concedes that he eventually did join the conspiracy. Under Rule 801(d)(2)(E), a conspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. United States Gypsum Co.,* 333 U.S. 364, 393, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *United States v. Balistrieri,* 778 F.2d 1226, 1230–31 (7th Cir. 1985). Since the conspiracy existed when Graves made the statement, and Laskowski later joined the conspiracy, Graves' statement about Laskowski's marijuana dealing was admissible under Rule 801(d)(2)(E).

Laskowski contends that even if Graves' statement was admissible under Rule 801(d)(2)(E), the district court should have excluded it under Fed.R.Evid. 404(b). Rule 404(b) generally excludes evidence of a defendant's prior bad acts to prove that because the person committed the prior bad act, he likely committed the act at issue. According to Laskowski, Graves' statement does not meet the requirements this circuit has established for introducing evidence of prior bad acts under Rule 404(b).[2]

As we have seen, Graves made his statement about Laskowski in furtherance of the conspiracy. The statement served to ease Petersen's fears, and to smooth the way for Laskowski's eventual entry into the conspiracy. The statement, in short, was "intricately related to the facts of this case." *United States v. Hawkins,* 823 F.2d 1020, 1023 (7th Cir.1987). As such, the statement was not evidence of a prior bad act within Rule 404(b)'s meaning, and we need not determine whether it met all the requirements for admitting evidence under Rule 404(b). See *United States v. D'Antoni,* 874 F.2d 1214, 1216–17 (7th Cir. 1989); *Hawkins,* 823 F.2d at 1023.

Even though Graves' statement did not have to meet all of Rule 404(b)'s requirements, we still must determine whether the district court abused its discretion in determining under Fed.R.Evid. 403 that the statement's potential for unfair prejudice did not substantially outweigh its probative value. The potential for unfair prejudice is obvious: the chance existed that the jury would draw the forbidden inference that because Laskowski had been involved in marijuana trafficking in the past, he was probably involved in the cocaine trafficking the government alleged. On the other hand, although the statement was not absolutely essential to the government's case, it was important for the government to show why Petersen and Raffanti would deal with Laskowski; the jury could reasonably wonder, absent some explanation, how or why Laskowski became involved in the conspiracy, and this, in turn, could cause the jury to be less likely to believe Laskowski was involved in the conspiracy. The balancing question seems close; and since the balance is close, the district court did not abuse its discretion by finding that the danger of unfair prejudice does not "substantially" outweigh the statement's probative value. Cf.

2. The government's entire response to Laskowski's Rule 404(b) argument is the cryptic statement that "The government is not arguing that Rule 404(b) applies to the statement." Whether the government wants to argue that Rule 404(b) applies is beside the point; Laskowski has argued that Rule 404(b) applies, and that Rule 404(b) bars Graves' statement. The government has a responsibility to this court to respond to an appellant's arguments. If the government thinks an argument is irrelevant, waived, or frivolous (and Laskowski's argument is none of the three), it should say so, and tell us why, with appropriate citations to authority.

*United States v. Chaverra-Cardona,* 879 F.2d 1551, 1554 (7th Cir.1989).

Laskowski complains that the government referred to Graves' statement in its opening and closing arguments. Although he does not develop the point, Laskowski seems to imply that the government sought to take advantage of the inference that Laskowski was more likely to have dealt cocaine because he had previously dealt marijuana, and that this shows that the danger for unfair prejudice outweighed the statement's probative value. Laskowski points us to two brief references by the government—one in its opening statement and one in its closing argument—to the effect that Laskowski had been introduced to Petersen as a "million dollar marijuana dealer," and that Laskowski was looking to get into the cocaine business.

Although it is possible to interpret these statements as arguing the inference that Laskowski was more likely to deal cocaine because he had previously dealt marijuana, these statements do not warrant reversal. The government's arguments were factually accurate and directly tracked the testimony. The government did not argue that Laskowski was a marijuana dealer; the government argued, as Petersen testified, that Laskowski had been introduced as a marijuana dealer. Moreover, the government did not directly argue the inference that Laskowski's prior marijuana dealing made it more likely that Laskowski dealt cocaine. Perhaps most importantly, Laskowski never asked the district court to limit the purposes for which the jury could consider Graves' statement, and never objected to the government's argument. Indeed, far from objecting, Laskowski's trial attorney attempted to use Graves' statement in his own closing argument to highlight what he perceived as the weakness of the government's case.

Trial counsel called the statement a "cheap shot," and questioned why the government had not produced Teddy Graves to testify if the accusation about marijuana dealing was true. The implication is apparent: if the government has to stoop so low to try to convict Laskowski, it cannot have much of a case. This was reasonable trial strategy. But Laskowski cannot have it both ways: he cannot fail to object to the government's statements and try to use them to his own advantage at trial, and then ask us to reverse his conviction on appeal because of those statements.

*2. Evidence of Bell's kidnapping.*

Carricaburu and Duque argue that the district court erred in admitting Walter Bell's testimony that they kidnapped him. Bell testified that on March 19, 1986, he flew to Chicago from Florida to pick up money for Gorny from a man named "Billy." Billy told Bell he did not have the money. Bell returned to his hotel. Carricaburu, who had been told by Gorny that Bell was supposed to have the money, later came to Bell's room and asked, "Did you get the money?" Bell explained that he did not have the money, and suggested that Carricaburu call Gorny to straighten things out. Carricaburu could not reach Gorny, so he told Bell that they would go back to Florida the next day.

Duque was waiting when Carricaburu and Bell arrived at the airport in Florida. After Bell unsuccessfully tried to call Gorny from an airport telephone, he told Duque and Carricaburu he would drive them to Gorny's shop. While the three were driving, Carricaburu told Bell to turn off on a certain road. When Bell asked why, Duque, who was sitting in the rear seat, stuck a gun in Bell's ear and said, "Do you know what us ... Colombians are like?" Bell proceeded, at Duque's direction, to drive to Duque's house. Duque and Carricaburu held Bell at the house. After several days, they released him.

About a week after the kidnapping, Gorny and Bell met with Duque and Carricaburu. Gorny was upset about what Duque and Carricaburu had done and explained to them that Bell had been unable to contact him because his sailboat had been stuck on a sandbar in the Florida Keys. Gorny also told them, "Don't you think that it's ... time that you had trusted me? This should have never happened. I've got a good mind to quit it right here and now." Even-

tually, though, Gorny and Duque and Carricaburu smoothed out their differences and, in Bell's words, "agreed to continue doing their business."

Duque and Carricaburu argue that the district court abused its discretion by admitting evidence that they kidnapped Bell. According to Duque and Carricaburu, that evidence was evidence of other crimes and did not meet Fed.R.Evid. 404(b)'s requirements for admitting other crimes evidence. As was the case with the testimony about Laskowski's marijuana dealings, however, Rule 404(b) does not apply because Bell's testimony was "intricately related to the facts of this case." *United States v. Hawkins,* 823 F.2d at 1023. The kidnapping occurred during the course of the conspiracy, and as part of Duque's and Carricaburu's participation in the conspiracy. It was not an "other act" within Rule 404(b).

Since Rule 404(b) does not apply, we need only analyze the evidence under Rule 403. The probative value was strong. Aside from the attempted cocaine sale on April 8, the kidnapping was the strongest evidence of Duque's participation in the conspiracy. It was also strong evidence of Carricaburu's participation. The evidence of the kidnapping was certainly prejudicial, but all probative evidence is prejudicial to the party against whom it is introduced. The prejudice was not unfair. The government has a right to introduce direct evidence of a defendant's participation in a crime, even if the details of that participation are shocking or repulsive (characterizations that apply only marginally, if at all, to the evidence of Bell's kidnapping in this case). The district court did not abuse its discretion in admitting evidence of Bell's kidnapping.

*3. Admission of recorded statements mentioning other co-conspirators.*

Duque argues that the district court erred by allowing the government to introduce tape recorded conversations between Petersen and several other defendants. During those conversations, Petersen and the people he was speaking to referred to Velasquez and Campos, defendants in this case, and Gorny and Bell, who pleaded guilty and were not defendants. These references to Velasquez, Campos, Gorny, and Bell tended to show that they had participated in the conspiracy.

Duque claims that by admitting the taped statements without deleting the references to other conspirators, the district court violated his Sixth Amendment right to confrontation. In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that a defendant at a joint trial is deprived of his right to confrontation when the court admits a nontestifying codefendant's confession implicating him in the crime, even if the court instructs the jury to consider the confession only against the codefendant. See also *Richardson v. Marsh,* 481 U.S. 200, 201–02, 107 S.Ct. 1702, 1704, 95 L.Ed.2d 176 (1987). Although the law normally presumes that jurors will follow instructions to consider evidence only against a codefendant, the Court in *Bruton* reasoned that the risk the jury will not follow the instruction is too great "when the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial...." *Bruton,* 391 U.S. at 135–36, 88 S.Ct. at 1627–28.

Duque does not distinguish between Petersen's statements and the statements of the codefendants he was talking to but there is an important difference between those statements. Since *Bruton* is a confrontation case, Petersen's statements did not violate Bruton because he testified and was available for cross-examination. The only statements Duque can contend violated *Bruton* are those of the codefendants who spoke to Petersen, since they were not available for cross-examination.

As to those statements, Duque contends that any references to Gorny and Bell implicated him because Gorny and Bell were his only links to the conspiracy. (Duque does not state how references to Velasquez and Campos possibly could have

harmed him, so we need not consider those references.) However, none of the taped statements Duque complains about mentions him directly, and the taped conversations do not contain references to unidentified people that the jury would invariably conclude were meant as references to him. Since none of the statements either directly or indirectly referred to Duque, the only way the statements could implicate him was if the jury linked the statements (specifically, the references to Gorny and Bell) to other testimony at trial.[3]

In *Richardson v. Marsh,* the Court held that when a non-testifying codefendant's statement must be linked to other evidence to implicate a defendant, admitting the statement at a joint trial does not violate the Confrontation Clause so long as the trial judge adequately instructs the jury not to consider the statement against the defendant. See 481 U.S. at 208–11, 107 S.Ct. at 1707–09; see also *United States v. Sherlock,* 865 F.2d 1069, 1079–80 (9th Cir. 1989); *United States v. Garcia,* 836 F.2d 385, 390–91 (8th Cir.1987). In *Richardson,* the Court reasoned that where the jury must link a codefendant's statement to other evidence for the statement to implicate a defendant, the probability that the jury would not be able to follow a limiting instruction does not exist as it did in *Bruton.* See 481 U.S. at 208, 107 S.Ct. at 1707.

In this case, the trial judge instructed the jury repeatedly not to consider the recorded statements against anybody except the defendant speaking on the tape. The judge gave limiting instructions each time the government played a recording to the jury, and those instructions were placed at the beginning of the transcripts of the tapes provided to the jury. The judge also instructed the jury at the end of trial not to consider evidence admitted against one defendant against any other defendants. As in *Richardson,* we presume the jury followed these instructions. Thus, the statements were never admitted "against" Duque, see 481 U.S. at 206, 107 S.Ct. at 1706, and admitting the statements did not violate Duque's right to confrontation.[4]

D. Sufficiency of the Evidence

1. *Evidence to support Muelle's CCE conviction.*

Muelle contends the government did not produce sufficient evidence to convict him of conducting a CCE. To convict a defendant on a CCE count, the government must show: "(1) a predicate offense violating a specified drug law (2) as part of a 'continuing series' of drug violations (3) that occurred while the defendant was acting in concert with five or more people (4) to whom the defendant occupied the position of an organizer or manager and from which series the defendant (5) obtained substantial income or resources." *United States v. Markowski,* 772 F.2d 358, 360–61 (7th Cir.1985); see 21 U.S.C. § 848. A "continuing series" of drug violations under the CCE statute means "at least three felony violations of the federal narcotics laws," though the defendant need not be convicted of three offenses. *Markowski,* 772 F.2d at 361–62.

Muelle contends the government did not prove that he committed three felo-

3. Whether the references to Gorny and Bell implicated Duque even when linked to other testimony is doubtful, but we need not analyze in detail Duque's rather weak argument that they did.

4. Duque makes two other arguments concerning the tape recordings. In his brief, he argues that Petersen's statements on the tapes were not admissible as coconspirator's statements in furtherance of the conspiracy under Fed.R.Evid. 801(d)(2)(E) because Petersen was no longer a conspirator when he made the statements, or as admissions by Petersen under Fed.R.Evid. 801(d)(2)(A) because Petersen was not a defendant at trial. However, in his reply brief, Duque abandons his challenge to the admission of Petersen's statements, conceding that Petersen's statements were admissible to provide the context for the statements by the defendants he was speaking to.

Second, even aside from *Bruton,* Duque contends that any references to Gorny and Bell buttressed the government's charge that Gorny and Bell were involved in the conspiracy. This may be so, but no harm resulted from this, even if improper. There was already overwhelming evidence that Gorny and Bell were involved; both were caught red-handed during the April 8 cocaine deal.

ny drug offenses, or that he managed or supervised five or more people. According to Muelle, the evidence at trial showed that he was not directly involved in three cocaine deals or that he directly supervised five people. The government's theory at trial, however, was that Sophie and Muelle were partners, with Muelle the senior or managing partner. Thus, says the government, Muelle was responsible for Sophie's cocaine deals with Petersen and Raffanti (each of which violated the federal drug laws). Moreover, since Muelle managed or supervised Sophie, Muelle, through Sophie, managed or supervised the people that Sophie managed or supervised. Cf. *United States v. Bond,* 847 F.2d 1233, 1236 (7th Cir.1988) (indirect supervision satisfies the CCE statute).

Muelle does not dispute the legal sufficiency of the government's theory. Nor does he dispute that Sophie managed or supervised five people or that Sophie conducted numerous cocaine deals with Petersen and Raffanti during the CCE period alleged in the indictment. The question, therefore, is whether there was evidence from which a reasonable jury could impute Sophie's actions to Muelle.

There was more than sufficient evidence to convict Muelle. Muelle complains that much of this evidence is from outside the CCE period charged in the indictment. For example, Raffanti testified that in 1981, at a meeting with Sophie and Muelle in Florida, Muelle told Raffanti that he could supply Raffanti with cocaine. In 1985, Petersen and Raffanti negotiated over a $10,000 price dispute directly with Muelle. Contrary to Muelle's argument, this evidence was relevant to show Muelle's connection with Sophie and the cocaine business; if Muelle was dealing cocaine with Sophie and calling the shots in those deals immediately before and after the alleged CCE period, the jury could reasonably infer that Muelle was calling the shots for Sophie's cocaine deals during the alleged period.

Even confining ourselves to the evidence from April 1983 to August 1984, there was ample evidence to convict Muelle. In September 1983, Petersen and Raffanti were discussing a 10-kilogram cocaine deal with Sophie; Sophie stated that he had to discuss price and quantity with Muelle. In May 1984, Petersen went to Sophie's apartment in Florida to test a shipment of cocaine. The cocaine was late in arriving, and Sophie kept calling Muelle "to see when it is coming." Muelle arrived and talked to Sophie; the cocaine arrived a short time later. Petersen then discussed price and quantity with Muelle and Sophie, and bought 10 kilograms. Terry Hinkle, who drove cocaine from Florida to Chicago, testified that when she wanted her name off the title of a load car, she talked to Muelle, who told her that he would "get on [Sophie's] case" about transferring title for her. Sophie referred to Muelle as "the boss" when talking to Hinkle, and Hinkle twice heard Sophie talk to "Miguel" on a hotel telephone in Chicago during drug deliveries. Another driver testified that he saw Muelle pick up three or four accordion files filled with $100 bills from Sophie's apartment.

We have only mentioned examples of the evidence against Muelle; there is more. Perhaps most damaging to Muelle were phone records that showed Muelle making phone calls to Sophie's Chicago hotel rooms, Raffanti's apartment, and Petersen's and Sophie's electronic pagers at times when Sophie was making deliveries in Chicago. A number of these calls coincided with records showing that Raffanti and Petersen had made deposits (which they testified were cocaine) in their safe deposit boxes. It is true that many of these phone records were from dates outside the CCE period alleged in the indictment. But, as we have noted, this evidence was relevant to show Muelle's connection with Sophie's cocaine dealing during the alleged period, especially given all the evidence from that period that connects Muelle and Sophie. In the face of all the evidence against him, Muelle's claim of insufficient evidence borders on being frivolous.

Muelle makes one more argument concerning his CCE conviction. According to Muelle, Petersen and Raffanti were the

real "kingpins" of the conspiracy in this case. Muelle was just one of many suppliers Petersen and Raffanti bought cocaine from. Because he was not a manager or supervisor in Petersen's and Raffanti's enterprise, Muelle argues that he could not be convicted for conducting a CCE. This argument is nonsense. A person selling drugs to one enterprise who runs an enterprise of his own meeting all the CCE statute's requirements violates the CCE Act even if he is not a manager or supervisor in the purchasing enterprise. See *Bond,* 847 F.2d at 1236–37 (conviction for CCE of person similarly situated to Muelle); see also *United States v. Pino–Perez,* 870 F.2d 1230, 1241 (7th Cir.1989) (Easterbrook, J., dissenting). A manager of one enterprise is no less a manager of that enterprise because he is not a manager of all the other enterprises he deals with. The evidence showed that Muelle managed a continuing criminal enterprise that sold cocaine to Petersen and Raffanti. His CCE conviction was proper.

2. *Evidence to convict Duque and Carricaburu.*

Duque and Carricaburu contend that the government introduced insufficient evidence to convict them of any of the charges against them. Viewing the evidence in the light most favorable to the government, we disagree. Bell testified that he made numerous deliveries of cocaine for Gorny, and that Carricaburu was his "contact." Bell also testified that Duque and Carricaburu kidnapped him because he had been unable to collect money due them for a cocaine delivery he had made. This testimony, in itself, was sufficient to show that Duque and Carricaburu sold cocaine to Gorny during the conspiracy.

Duque and Carricaburu insist, however, that we must disregard Bell's testimony because it was inherently unbelievable. According to Duque and Carricaburu, Bell had ample motive to lie (he had pleaded guilty in exchange for his cooperation) and admitted perjuring himself before the grand jury investigating this case. They also point out that Bell's cross-examination revealed several inconsistencies between his trial testimony and his grand jury testimony. Duque and Carricaburu assert that without Bell's testimony, there was not enough evidence to convict them.

This argument is meritless. Bell's testimony was not inherently unbelievable in the sense that it contradicted the laws of nature or other indisputably true evidence. See *United States v. Dunigan,* 884 F.2d at 1013. There were some inconsistencies in Bell's testimony, but those inconsistencies were for the jury to sort out. Those inconsistencies were, for the most part, minor, and Bell explained them on redirect examination. And Carricaburu's and Duque's reference to Bell as an "admitted perjurer" is overblown and misleading. On cross-examination, Duque's attorney asked Bell if he had committed "perjury" before the grand jury; Bell answered yes. But upon further questioning, Bell stated that he had not "knowingly" committed perjury. It is apparent from this that Bell did not know what perjury is, and that he thought that anytime he testified inaccurately he had committed "perjury." Even if Bell had admitted perjuring himself before the grand jury, the jury would still have been entitled to believe his trial testimony.

Moreover, the evidence of Duque's and Carricaburu's involvement in the attempted sale on April 8, 1986, is particularly strong. Bell testified that on April 7 he registered in Room 1018 at the O'Hare Plaza Hotel in Chicago. The DEA agents who arrested Bell found a key for that room at the O'Hare Plaza in his pocket. Bell testified that around noon on April 8, Carricaburu came to his room and told him "they arrived and our room number is 725 [at the O'Hare Plaza]." Bell said he wrote the number on the hotel note pad; along with the room key, the agents who arrested Bell found a piece of note paper from the O'Hare Plaza with the number "725" in his pocket. Bell went to Room 725, and took several packages from Duque and Carricaburu. He then took a cab to Woodfield Mall, where he was arrested after DEA agent Fanter determined that the bag he

had placed in a locker at the mall contained cocaine.

Bell's testimony, corroborated by physical evidence and by Agent Fanter's testimony, was sufficient in itself to convict Duque and Carricaburu. But there is much more. The O'Hare Plaza's manager testified that a Spanish-speaking woman identifying herself as "Mrs. Duque" tried to register at the hotel but was unable to complete the registration form. A man then came in, completed the form, and signed the form as "Humberto Duque." A handwriting expert identified the writing as Duque's. Two men were with Duque, one of whom the manager identified as Carricaburu. Carricaburu was carrying an attache case.

After Bell's arrest, DEA agent Alphonse Savory saw a man enter Room 725 at the O'Hare Plaza. Upon questioning the man's wife, he found out the man's name was Manuel Mantia. The woman told Savory that she and Mantia were in town celebrating Christmas (on April 8!). Savory went to Room 725 and found Duque, Carricaburu, and Mantia there. Duque told federal agents that he was staying in Room 3132 at the Chicago Marriott. Agents found a number of items on Duque and Carricaburu at the time of their arrests, including a key and receipt for Room 3132 at the Marriott, pieces of false identification, and records showing they had just traveled from Florida to Chicago. Duque's phone book contained phone numbers for Carricaburu and Bell. Agents also searched Mantia's car, which was registered to somebody in New York (the state that Gorny had told Fanter the cocaine would be coming from). The agents found a hidden compartment in the car to which trained narcotics-sniffing dogs alerted positively.

Finally, the government introduced tapes of several phone calls Gorny made on April 8. Gorny called Room 3132 at the Marriott (Duque's room) and said, "I want to be ready by noon." He called Room 1018 at the O'Hare Plaza (Bell's room) and said, "You'll hear from me ... in a little bit." He called Room 3132 again and said, "Humberto? ... [t]ake this number six nine three, five eight zero zero room ten eighteen [1018] that's Walter [Bell] ... take a five out there okay ... its right by the airport ... be fast...." Gorny made another call, saying, "Call Walt and tell him to call me as soon as [it] gets there," and another, to Bell, telling him that "George is supposed to get a hold of you, when he does call me ... he should call within the half...." According to Petersen, who was with Gorny when he made the calls, Gorny was "putting the deal together."

This overwhelming evidence implicated Duque and Carricaburu in the April 8 attempted sale. Bell's testimony about the deal and all the other evidence that corroborated that testimony strengthened the inference that Bell was telling the truth about the other events he testified about, including the kidnapping. In short, there was ample evidence to convict Duque and Carricaburu.

E. Alleged Fatal Variance

Muelle and Duque argue that the evidence at trial established the existence of multiple conspiracies rather than the single conspiracy alleged in the indictment. According to Muelle and Duque, this fatal variance requires reversal.

Whether a single conspiracy existed is a fact question. *United States v. Whaley,* 830 F.2d 1469, 1472 (7th Cir.1978). To convict a defendant for participating in a conspiracy, the government must show that the defendant was a party to an agreement to commit an unlawful act, and that one of the conspirators committed an overt act to further the agreement. See *United States v. Mealy,* 851 F.2d 890, 895–96 (7th Cir.1988). A single conspiracy does not exist just because a number of people committed illegal acts with the same person. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The government must show some connection between the participants. *Id.* at 755, 66 S.Ct. at 1243. But to be a member of a conspiracy, a person does not need to know or participate in every detail of the conspiracy, or to know all the conspiracy's mem-

bers. *United States v. Davis,* 838 F.2d 909, 913 (7th Cir.1988). A conspiracy may have a small core of people with whom other conspirators act to achieve the conspiracy's goal. See *id.*

In this case, Petersen, Raffanti, and later Gorny, formed the conspiracy's core. The conspiracy's objective was to buy and resell cocaine. The structure of the alleged conspiracy in this case is very much like the structure of the conspiracy in *Mealy.* In *Mealy,* Ingold ran an organization that bought marijuana from various suppliers and sold it to various customers between 1981 and 1986. In 1983, Mealy and Rhodes sold marijuana to Ingold. In 1986, Mealy and Rhodes sold more marijuana to Ingold. At trial and on appeal, Mealy contended that he was involved in two separate conspiracies—one in 1983, and the other in 1986—rather than in one larger conspiracy as the indictment alleged. See 851 F.2d at 894–96. This court, after examining the evidence against Mealy, held that the jury could properly find that Mealy knowingly participated in Ingold's longer ongoing conspiracy. See *id.* at 896–97.

Muelle and Duque argue that Petersen and Raffanti changed suppliers at least four times during the course of their enterprise. According to Muelle and Duque, every time a new supplier came on the scene, a new conspiracy began. Not so. " 'As long as the conspiracy continues and its goal is to achieve a common objective, ... parties may still be found guilty even though they join or terminate their relationship with the core conspirators at different times.' " *Davis,* 838 F.2d at 913 (quoting *United States v. Noble,* 754 F.2d 1324, 1329 (7th Cir.1985). That is exactly the situation in this case. Petersen's and Raffanti's conspiracy continued on, with the same objective—to buy and resell cocaine. The fact that old suppliers left the conspiracy and new suppliers entered does not mean that those suppliers cannot be found guilty for participating in that conspiracy.

*Mealy* and *Davis* show that it is proper to view the type of conspiracy charged here—an ongoing drug distribution conspiracy involving core members who buy from and sell to various suppliers and dealers who may change over time—as a single conspiracy rather than as a series of smaller separate conspiracies. The key question is whether the government presented sufficient evidence to show that the defendants outside the core who engaged in transactions with the core conspirators knew about (or must have known about, which is the same thing) the core conspirators' objective and embraced that objective.

The only defendant who challenges the sufficiency of the government's evidence to show that his dealings with the core conspirators amounted to knowing participation in their conspiracy is Duque.[5] Duque contends that the conspiracy ended in February 1986, when Petersen and Raffanti were arrested, and that there was no direct evidence from which the jury could find that he sold cocaine to Petersen, Raffanti, or Gorny before that time. Duque further contends that even if the conspiracy did not end until after Gorny's arrest in April 1986 (a time after which Duque concedes there is evidence to show he sold cocaine to Gorny) or if there is sufficient evidence to show he sold cocaine to the partnership before Petersen's and Raffanti's arrests, there is insufficient evidence to show that he knew about, and therefore knowingly participated in, the larger conspiracy.

There was sufficient evidence for the jury to find that any sales Duque made while the conspiracy was still active constituted knowing participation in the conspiracy. It does not matter that Duque did not participate in the conspiracy from the beginning, and that Duque did not know all

5. Carricaburu's challenge to the sufficiency of the evidence went only to whether the government proved he had sold cocaine, not whether any sales he made amounted to knowing participation in the larger conspiracy. While Muelle contends that a fatal variance exists in this case, his entire "argument" consists of a sentence adopting Duque's argument. Since Muelle has not bothered to analyze how the evidence against him might have been insufficient to show that he knowingly participated in the conspiracy, we need not consider that issue.

the participants in the conspiracy; as we have seen, conspirators can come and go from an ongoing conspiracy, and a person need not know all the details of, or participants in, a conspiracy to be convicted for joining the conspiracy. The jury could find that Duque knew of, and agreed to further, the conspiracy's goals—the buying and reselling of cocaine—because there was evidence that Duque knew, or must have known, that Petersen, Raffanti, and Gorny were selling the cocaine to smaller-scale dealers. The jury could infer this from the amounts Duque sold; people do not regularly buy multiple kilograms of cocaine for personal use. Moreover, the structure of the transactions shows Duque knew Gorny was reselling the cocaine. Bell testified to making deliveries in which the cocaine he delivered had been "fronted"; he or Gorny were to get the money to pay for the cocaine directly from the dealer Gorny was selling to. Indeed, Bell's kidnapping resulted from such a transaction in which he failed to obtain the money from a dealer. Duque would not have conducted the transactions this way unless he knew that Gorny could sell the cocaine. Thus, the jury could find that Duque knowingly joined a conspiracy to sell the cocaine he supplied to other dealers.

The jury could also find that any cocaine sales Duque made to Gorny occurred while the conspiracy was still active. First, as we have seen, there was sufficient evidence from which the jury could believe that Duque was supplying cocaine to the conspiracy before Petersen's and Raffanti's arrests. Bell testified about numerous deliveries he made in January and February 1986. He also testified that his "contact" for these deliveries was Carricaburu. From the evidence of Bell's kidnapping in March 1986 by Duque and Carricaburu, and the evidence of the attempted sale to Gorny (and, through Gorny, DEA agent Fanter) in April, the jury could reasonably infer that Carricaburu and Duque worked together, with Carricaburu as the point man and Duque in the background. Thus, the jury could infer that Duque was involved with Carricaburu in supplying cocaine to Gorny.

Moreover, Petersen's and Raffanti's arrests did not end the conspiracy. "A co-conspirator's arrest does not automatically terminate a conspiracy; the remaining conspirators may continue to carry out the goals of the conspiracy notwithstanding the arrest of one of the partners." *Mealy,* 851 F.2d at 901. Gorny, who was Petersen's and Raffanti's full partner, continued selling cocaine to the partnership's normal customers. Duque, who had joined the conspiracy before Petersen's and Raffanti's arrests, continued to supply cocaine to Gorny. Gorny and Duque continued to carry out the conspiracy's goals—the purchase and resale of cocaine—after Petersen and Raffanti were gone from the scene. The sales Duque made after Petersen's and Raffanti's arrests were still part of the conspiracy. Duque argues that the cocaine he attempted to sell to Gorny was to ultimately go to DEA agent Fanter. According to Duque, this takes that sale out of the conspiracy because a person cannot conspire with a government agent who seeks to thwart the conspiracy. That may be so but it is irrelevant here. Duque conspired with Gorny, a member of the conspiracy; it makes no difference who the ultimate buyer was. Cf. *Mealy,* 851 F.2d at 901 (rejecting the contention that statements made by conspirators to former compatriots who had become government agents were not made to further the conspiracy; all that mattered was that the unarrested conspirators were still capable of carrying on the ongoing conspiracy). Besides, as we have seen, there was sufficient evidence that Duque made sales to Gorny as part of the conspiracy, both before and after Petersen's and Raffanti's arrests. Duque has not shown any fatal variance in this case; his conviction for participating in the conspiracy alleged in the indictment was proper.

F. Duque's Sentence

The district court sentenced Duque to ten years in prison (ten years for his conviction on Count Nine, the April 8 attempted sale, and a concurrent ten years for his conviction on Count One, the con-

spiracy count). Duque contends this sentence was excessive. However, this sentence was within the maximum term specified by Congress, and Duque has failed to show that the court relied on inaccurate information or failed to exercise any discretion at all in sentencing. See *United States v. Threw,* 861 F.2d 1046, 1049 (7th Cir.1988). His sentence was proper.

III.

All the defendants argue that it was error to join in the same indictment the conspiracy count and the counts involving acts within the conspiracy's course with the counts alleging conduct after the conspiracy by Campos, Velasquez, and Pollak. Federal Rule of Criminal Procedure 8(b) governs the joinder of different defendants in the same indictment. Rule 8(b) provides:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.

Thus, to be properly joined in the same indictment, the conspiracy and the post-conspiracy acts had to be part of a "series of acts or transactions constituting an offense or offenses."

In deciding whether the post-conspiracy acts were part of the same "series of acts or transactions" as the acts charged as part of that conspiracy, we begin by recognizing that this court has construed Rule 8 "broadly to allow liberal joinder...." *United States v. Cavale,* 688 F.2d 1098, 1106 (7th Cir.1982). That is so because joint trials offer several benefits over a series of separate trials. Joint trials increase court efficiency, save witnesses the inconvenience of repeating their testimony at different trials, and avoid delays in bringing defendants to trial. See *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986). Moreover, a joint trial aids in the search for truth by giving the jury "the best perspective on all the evidence"; one jury gets to see the case as a whole, rather than several juries seeing it in bits and pieces. See *United States v. Buljubasic,* 808 F.2d 1260, 1263 (7th Cir.1987).

On the other hand, joint trials do often present the danger of prejudice to defendants. Evidence concerning the most guilty defendants might, in the eyes of the jury, implicate less guilty defendants by association. The sheer confusion resulting from trying numerous defendants together may also prejudice defendants; the jury may not be able to keep track of which evidence applies to which defendant, and may end up lumping all the defendants together. See *United States v. Velasquez,* 772 F.2d 1348, 1352 (7th Cir.1985).

Rule 8(b) strikes a compromise between the perceived benefits and burdens of joint trials of defendants who participate in the "same series of acts or transactions." In the usual case, "same series of acts or transactions" means acts that were pursuant to a common scheme or plan. See *Velasquez,* 772 F.2d at 1353. It makes sense to try such crimes together: much of the evidence will overlap anyway, and trying all participants at once will give a better, and more accurate, picture of the case as a whole. It is not enough, however, that the crimes were of "similar character," the test for joining different offenses against one offender in the same indictment under Rule 8(a). That would allow the government to conduct "mass trials"—for example, trials of people accused of unrelated narcotics offenses. See *id.* at 1352. While mass trials might be convenient for the government, they would not present any advantages in the search for truth—there is no "whole" to see in perspective—while at the same time presenting the dangers of prejudice involved in joint trials.

If Petersen had not been cooperating with the government when he arranged the post-conspiracy deals with Campos, Velasquez, and Pollak, this would be an easy case. Despite Petersen's arrest, the government could have in good faith charged those transactions as part of the conspiracy because, as we have seen, Petersen's arrest would not necessarily have ended the conspiracy. Even if the jury had found that those acts were not part of the

conspiracy, joinder would have been proper because the failure of the overarching conspiracy charge would not result in misjoinder if the government charged the conspiracy in good faith; joinder under Rule 8(b) is a matter of pleading, not trial proof. *Schaffer v. United States,* 362 U.S. 511, 514–17, 80 S.Ct. 945, 947–49, 4 L.Ed.2d 921 (1960). And even if the government had decided not to include the later counts against Campos, Velasquez, and Pollak in the conspiracy, joinder still would have been proper because the government could have charged the counts as part of the conspiracy. *Velasquez,* 772 F.2d at 1353.

The complicating factor in this case is Petersen's cooperation with the government. The other core conspirators had been arrested, and the government admits the conspiracy had ended. Thus, the deals Petersen set up for the government with Campos, Velasquez, and Pollak were not part of the conspiracy, and could not have been charged as part of the conspiracy. However, in this case, we do not think that complication resulted in misjoinder.

The allegedly misjoined crimes all involved Petersen and some other active conspiracy member. The deals with Campos, Velasquez, and Pollak all grew out of the conspiracy. Petersen's ability to contact and deal with these people stemmed from his past dealings with them during the conspiracy. From Campos', Velasquez's, and Pollak's points of view, the post-conspiracy deals could be seen as just a continuation of the conspiracy. Campos, Velasquez, and Pollak were attempting to carry out the common plan that underlay the conspiracy; unfortunately for them, Petersen was working for the government. In that sense, those deals can be said to be part of the same scheme or plan—to buy and sell cocaine through Petersen (and the other core conspirators)—as the deals that occurred during the conspiracy.

There is language in *Velasquez* that implies charges are improperly joined unless the charges could have been charged as one conspiracy. *Id.* But *Velasquez* itself qualifies that language by saying that a single conspiracy is necessary "in the usual case." *Id.* Moreover, *Velasquez* involved an indictment charging five defendants with trafficking in cocaine, four of those defendants with retaliating and conspiring to retaliate against two witnesses to the cocaine charges, and one defendant with unrelated heroin violations. *Id.* at 1351. We held in *Velasquez* that since the heroin charges were completely unrelated to the other charges in the indictment, those charges were misjoined with the others. But the post-conspiracy charges in this case are not unrelated to the conspiracy; as we have seen, the post-conspiracy charges involved conspiracy members dealing with a core conspirator as they had dealt with him in drug transactions during the conspiracy. Allowing joinder in this case does not open the door to mass trials as allowing joinder of completely unrelated offenses would.

Even if the post-conspiracy charges were misjoined, we would affirm because any error was harmless. See *Lane,* 474 U.S. at 444–50, 106 S.Ct. at 729–32; *Velasquez,* 772 F.2d at 1356; Fed. R.Crim.P. 52(a). Since Campos, Velasquez, and Pollak were part of the conspiracy, and could have been tried along with the other conspirators anyway, trying the post-conspiracy charges at the same trial did not present any additional danger of smearing the other defendants merely by their association with Campos, Velasquez, and Pollak. The defendants assert that the case against them depended, in large part, on Petersen's credibility. Trying the post-conspiracy charges at the same trial as the conspiracy charges allowed the government to use the evidence of the controlled post-conspiracy transactions (including the recorded phone conversations) to boost the credibility of Petersen's testimony concerning earlier transactions. This argument does not apply to Campos, Velasquez, and Pollak because the evidence of the controlled transactions they participated in would have been admissible against them even at separate trials. Even as to the other defendants, we see little, if any, prejudice. Much of Petersen's testimony was

corroborated by other witnesses' testimony, particularly Raffanti's and Hinkle's. Petersen's testimony about Muelle's and Sophie's participation was corroborated by phone and pager records, partnership account books, and safe deposit box, hotel, and travel records. Duque and Carricaburu were arrested minutes after a controlled transaction with Gorny arranged by Petersen, and overwhelming evidence supports their participation in that transaction. This evidence, in turn, buttressed Bell's testimony about his activities and his kidnapping by Duque and Carricaburu—testimony that, in any event, did not depend on the jury's assessment of Petersen's credibility, and was thus not boosted by any of the post-conspiracy evidence. Laskowski admitted to DEA agents that he had purchased cocaine from Petersen.

The evidence implicating all the defendants in the crimes charged against them was very strong, and much of Petersen's testimony was amply corroborated. The evidence on the allegedly misjoined counts was well-defined and easily segregated from the rest of the evidence in the case. Moreover, each time the government played one of Petersen's recorded conversations with Campos, Velasquez, or Pollak, the district court instructed the jury to consider that evidence only against the person participating in the conversation; the court repeated that instruction in the final charge. The court also instructed the jury to analyze the evidence against each defendant separately. The defendants offer no reason why the jury was unable to follow these instructions, and given the distinct roles each of the defendants played in the conspiracy, we assume the jury did follow these instructions. See *Cavale,* 688 F.2d at 1108. Given these factors, we conclude that any error in joining the post-conspiracy counts with the conspiracy counts did not have a "substantial influence" on the jury's verdict. Cf. *Lane,* 474 U.S. at 450, 106 S.Ct. at 732.

Duque argues that even if there was no reversible error in joining the conspiracy and post-conspiracy offenses, the district court erred in denying his motion to sever his case from those of his co-defendants. Federal Rule of Criminal Procedure 14 allows a district court, in its discretion, to sever a defendant's case properly joined with other defendants' cases under Rule 8 if the defendant demonstrates severe prejudice resulting from the misjoinder. See *United States v. Moya-Gomez,* 860 F.2d 706, 767–68 (7th Cir.1988); *Velasquez,* 772 F.2d at 1352. As is apparent from our discussions of the prejudice resulting from the alleged misjoinder, and the sufficiency of the evidence to convict him, Duque has not established that jointly trying him with the other defendants severely prejudiced him. The district court did not abuse its discretion in denying Duque's motion.

For the reasons stated above, we affirm the defendants' convictions and Duque's sentence.

AFFIRMED.