**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James J. AQUILLA, Defendant–Appellant.**

**No. 91–1951.**

United States Court of Appeals, Seventh Circuit.

Argued June 12, 1992.

Decided Sept. 29, 1992.

Barry R. Elden, Asst. U.S. Atty. and James J. Tharp (argued), Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Adam Bourgeois (argued), Chicago, Ill., for defendant-appellant.

Before CUMMINGS and MANION, Circuit Judges, and GORDON, Senior District Judge.*

MANION, Circuit Judge.

James Aquilla was convicted of one count of conspiracy to distribute cocaine, two counts of distributing cocaine, and one count of using a telephone to facilitate a violation of the narcotics laws. The district court, after rejecting Aquilla's argument that he had accepted responsibility for his crimes, sentenced Aquilla to 72 months imprisonment. Aquilla appeals his conviction and sentence. We affirm.

I.

This case centers around two distributions of cocaine Aquilla and a coconspirator, Henry Centracchio, made to Gary Lewellyn on May 10, 1988 and January 25, 1989. Unbeknownst to Aquilla and Centracchio, Lewellyn was working as an undercover informant for the FBI.

Lewellyn had begun working for the FBI and the DEA in 1984, when he was an inmate at the Federal Correctional Center in Sandstone, Minnesota. While at Sand-

---

* Hon. Myron L. Gordon, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

stone, Lewellyn met Thomas Guth (also known as Thomas Gucci). Lewellyn and Guth had a number of conversations about schemes for laundering drug money that Lewellyn reported to FBI.

After some time at Sandstone, Lewellyn was transferred to a minimum security prison camp at Maxwell Air Force Base in Alabama. Among Lewellyn's fellow prisoners at Maxwell was Jose Martinez of Miami, a convicted drug dealer. Martinez, who owned an air charter business, wanted to establish a cocaine distribution network in Chicago. As it turned out, Guth was looking for a source of cocaine to distribute in Chicago. After being released from prison, Guth visited Lewellyn at Maxwell in June 1987. With the FBI's blessing, Lewellyn brought Martinez and Guth together, and during the summer and early fall of 1987, the three established a plan to ship large quantities of cocaine from Miami to Chicago.

Martinez was released from prison in the summer of 1987. In late September, Guth received eight kilograms of cocaine from Martinez. Several weeks later, Guth received ten more kilograms of cocaine. Sales in Chicago, however, were slower than Guth expected, so Guth recruited Henry Centracchio, whom he had met in prison, to help distribute the cocaine and collect debts from customers. But even with Centracchio's help, sales continued to be slow, and Guth and Centracchio had trouble collecting payments. Because of this, Guth and Centracchio were unable to pay Martinez.

Guth and Centracchio attributed their problems to the poor quality of the cocaine Martinez had supplied. They told Lewellyn (who was still at Maxwell) that the best solution to their problems was for Martinez to continue to ship cocaine to Chicago for them to sell to generate cash. However, Martinez disagreed; he refused to ship any more cocaine to Chicago until Guth and Centracchio paid him in full for the first two shipments.

In January 1988, Lewellyn was released from Maxwell to a halfway house in Chicago so that he could continue to supply the

FBI information about cocaine trafficking. Over the next two months, Guth and Centracchio discussed with Lewellyn their problems concerning Martinez and their prospects for garnering additional cocaine. Eventually, the three had a luncheon meeting at the Rosebud restaurant in Chicago on March 1, which Lewellyn was surreptitiously recording. At the meeting, the three came up with a plan to run their distribution organization. Lewellyn, who was a former stockbroker, was to handle finances, and Centracchio, rather than Guth, was to handle the operation's logistics. Centracchio also told Lewellyn that he had a new supplier of cocaine: Aquilla, with whom Centracchio had met the night before, had told Centracchio that he wanted his and Guth's cocaine business, that he was expecting a shipment of 10 kilograms, and that he could possibly supply 20 to 100 kilograms a month to Centracchio.

As fate would have it, Aquilla also happened to be having lunch at the Rosebud on March 1. He ran into Centracchio, who introduced him to Lewellyn. The three exchanged small talk and pleasantries, but their conversation had nothing to do with cocaine.

Sometime after the luncheon meeting, Centracchio and Guth had a falling out because Centracchio believed that Guth was unreliable. Despite this falling out, there is evidence of drug deals between Aquilla and Guth. However, the two actual sales the indictment charged Aquilla with making were between him, Centracchio, and Lewellyn.

The first of these sales occurred on May 10, 1988. Centracchio and Lewellyn had arranged the deal during a series of recorded telephone calls in April and May. Lewellyn had a customer who needed cocaine, and Centracchio told Lewellyn that he could obtain the cocaine from Aquilla. The agreed sale price was to be $9,000, to be paid by Lewellyn when Centracchio delivered the cocaine.

On May 10, Aquilla met Centracchio. Aquilla gave Centracchio one-half kilogram of cocaine, which Centracchio placed in the trunk of his car. The two then drove in

Centracchio's car to the Marriott Hotel near O'Hare Airport and parked in the hotel parking lot. Lewellyn arrived shortly afterward. While Aquilla stayed in Centracchio's car, Lewellyn and Centracchio went inside the hotel. They came back out a short while later, and exchanged the cocaine and money. Centracchio told Lewellyn that he had obtained the cocaine from Aquilla. During the transaction, an FBI agent on surveillance duty saw Aquilla in Centracchio's car.

In August, Lewellyn suggested to Centracchio that they arrange another half-kilogram deal with Aquilla. After checking with Aquilla, Centracchio told Lewellyn that Aquilla wanted to deal only in whole kilograms. By October, though, Aquilla was looking for customers. He called Centracchio to ask him if he had heard from Guth or any of Centracchio's "other guys." Centracchio said he had not, but that he would try to line some things up.

Two days later, on on November 10, Lewellyn asked again about a possible half-kilogram deal. This time, Centracchio was receptive, and told Lewellyn that he would try to get hold of "the guy." Minutes later, Centracchio called Aquilla and asked, "Remember that ... half-size guy?" Aquilla said he did, and that a deal the following Tuesday might be possible.

No deal took place the following Tuesday, but over the next two months there were numerous recorded phone calls between Centracchio and Lewellyn, and Centracchio and Aquilla, attempting to arrange a deal. Finally, in January 1989, the deal was arranged. On January 25, Centracchio met Lewellyn at the Mr. Beef & Pizza Restaurant in Park Ridge. Centracchio did not have the cocaine with him. He explained to Lewellyn that Aquilla had the cocaine in a different location and that Aquilla wanted the money before he would give up the cocaine. Lewellyn refused to agree to this arrangement, so Centracchio left the restaurant and drove to the parking lot of a nearby shopping mall where Aquilla was waiting. Aquilla, who was carrying a bag containing one-half kilogram of cocaine, and Centracchio drove in Centracchio's car back to the restaurant. Centracchio went into the restaurant carrying the bag of cocaine Aquilla had given him, and met Lewellyn. Lewellyn went out to his car to get the money. He went back inside the restaurant, and he and Centracchio exchanged the money for the cocaine.

## II.

Aquilla was indicted and subsequently arrested in August 1989. The indictment charged him with conspiring with Centracchio, Guth, Martinez, and others to distribute multiple kilograms of cocaine. The indictment also charged Aquilla with distributing one-half kilogram of cocaine on May 10, 1988 and again on January 25, 1989. Finally, the indictment charged Aquilla with four counts of using the telephone, on November 10 and other dates, to facilitate violations of the narcotics laws. The district court dismissed two of the telephone counts. The jury acquitted Aquilla of another of the telephone counts, but convicted him on the telephone count alleging November 10 call, the conspiracy count, and both distribution counts.

Aquilla argues that the evidence was insufficient to support the jury's verdict on any of the counts of which it convicted him. On the distribution counts, Aquilla argues that the evidence was insufficient to show that he actually possessed the cocaine that was distributed to Lewellyn. However, Aquilla was charged with and convicted of distributing, not possessing, cocaine. Is possession an element of distribution? The cases are inconsistent. Compare *United States v. Jackson*, 526 F.2d 1236, 1238 (5th Cir.1976) ("possession is an element in the substantive charge of ... distribution") with *United States v. Stevens*, 521 F.2d 334, 337 n. 2 (6th Cir.1975) (distribution "can conceivably be proved without proof of possession") and *United States v. Brunty*, 701 F.2d 1375, 1381 (11th Cir.1983) (In addition to actually transferring possession of drugs, distribution may also consist of acts that simply further a transfer or sale, "such as arranging or supervising the delivery, or negotiating for or receiving the purchase price"). But the answer to this

question (which in any event was raised by neither Aquilla nor the government) is irrelevant in this case because in addition to evidence of distribution, there was evidence sufficient for the jury to find that Aquilla possessed the cocaine that was eventually delivered to Lewellyn. Centracchio testified that he received the cocaine for both transactions from Aquilla. This testimony was corroborated by taped statements by Centracchio to Lewellyn that Aquilla was the cocaine's source and by the fact that Aquilla was present at both transactions.

Aquilla complains about inconsistencies in Centracchio's testimony and that Centracchio testified on cross-examination that he often lied to Lewellyn about Aquilla's access to cocaine and Aquilla's drug-dealing activities. He also complains about perceived weaknesses in other witnesses' testimony. However, these inconsistencies and perceived weaknesses were for the jury to sort out. Cf. *United States v. Sophie*, 900 F.2d 1064, 1079 (7th Cir.1990); *United States v. Pace*, 898 F.2d 1218, 1234 (7th Cir.1990). The jury could reasonably believe Centracchio's trial testimony that he obtained the cocaine from Aquilla; that was sufficient to find that Aquilla possessed that cocaine, especially given the corroboration of that testimony.

We turn next to the telephone facilitation count. Aquilla argues that the November 10 telephone call between himself and Centracchio could not have facilitated any narcotics offense because no actual delivery occurred until January 25, more than two months later. He also argues that the conversation's content had nothing to do with drugs.

██ A telephone call "facilitates" the commission of a narcotics offense within the meaning of 21 U.S.C. § 843(b) if it " 'comes within the common meaning of facilitate—"to make easier" or less difficult, or to assist or aid.' " *United States v. Alvarez*, 860 F.2d 801, 813 (7th Cir.1988) (quoting *United States v. Phillips*, 664 F.2d 971, 1032 (5th Cir.1981)). Despite the fact that no actual sale occurred until January 25, the jury could reasonably find that the November 10 phone call facilitated that sale by "assist[ing] or aid[ing]" the sale. The November 10 conversation laid the groundwork for the sale on January 25 by alerting Aquilla that Lewellyn was looking to buy cocaine.

Moreover, the jury could reasonably find that the November 10 conversation was drug-related. It does not take an overactive imagination to conclude that references to a "half-size guy" are references to a half-kilogram of cocaine when made between two people who had previously collaborated in a half-kilogram sale to the same customer. Aquilla argues that he and Centracchio were talking about sewer work Centracchio had performed on a construction project for Aquilla, and that "half-size guy" referred to the bottom man on a sewer construction crew, who was generally small in size so that he could fit into the tight spaces of a sewer. This does not, however, explain why Aquilla and Centracchio were talking about small sewer workers just minutes after Centracchio and Lewellyn had been talking about half-kilograms of cocaine. The jury was free to reject Aquilla's story and accept the government's equally, if not more, plausible explanation of the conversation.

██ This brings us to Aquilla's argument that the evidence was insufficient to support his conspiracy conviction. The government's first response to this argument is that we need not consider it. At sentencing, the district court held Aquilla accountable only for the kilogram of cocaine he distributed to Lewellyn; because there was sufficient evidence to uphold the distribution counts, the government says that our decision on the conspiracy count would have no impact on Aquilla's sentence. This argument is enticing (it would save this court a bit of work to accept it), but it ignores the fact that the district court might have taken the conspiracy conviction into account in setting Aquilla's fine. It also ignores the $50 special assessment that a defendant must pay on each count for which he is convicted. See 18 U.S.C. § 3013(a)(2)(A). If the conspiracy conviction falls, so does the $50 assessment that accompanies that conviction; thus, the

conspiracy conviction does affect Aquilla's sentence.

So, we must examine whether there was sufficient evidence to support Aquilla's conspiracy conviction. As noted, the indictment charged Aquilla with conspiring with Guth, Centracchio, Martinez, and others to conduct an ongoing operation to distribute multiple kilograms of cocaine in the Chicago area. Aquilla's alleged role in the conspiracy was as a supplier: according to the indictment, Aquilla "would and did obtain multi-kilogram quantities of cocaine ... and would and did transport the said multi-kilogram quantities of cocaine through and from the state of Florida to the Northern District of Illinois for sale to purchasers of cocaine" by Centracchio and Guth.

Aquilla argues that the government did not prove the conspiracy alleged in the indictment. According to Aquilla, if the government proved any conspiracy, it proved two different conspiracies. The first was an agreement between Guth, Centracchio, and Martinez for Guth and Centracchio to distribute large quantities of cocaine supplied by Martinez. Aquilla argues that this conspiracy ended by the end of 1987 when Martinez refused to sell any more cocaine to Guth and Centracchio. The second conspiracy, and the only one that involved Aquilla, allegedly began when Centracchio began his quest to obtain cocaine for Lewellyn. By that time, says Aquilla, any relationship between Gucci and Centracchio had ceased, and the purposes, goals, and agreements related to the second conspiracy had no relationship to the first conspiracy.

■■■ A conspiracy is an agreement to commit a crime. See *United States v. Townsend*, 924 F.2d 1385, 1389–90 (7th Cir. 1991). The ultimate question in determining whether the government has proved the conspiracy it alleged in the indictment is whether the evidence would allow a reasonable jury to infer a single agreement among the defendants. See *id.* This does not necessarily mean that Aquilla had to conspire with everybody listed in the indictment. Conspirators may come and go, and changing membership in a conspiracy does

not necessarily mean that the original conspiracy has ended. See *id.; Sophie*, 900 F.2d at 1081. The government's theory is that Guth and Centracchio formed the core of an ongoing cocaine distribution operation that bought from various suppliers who changed over time. Cases such as *Sophie*, 900 F.2d at 1081, and *United States v. Mealy*, 851 F.2d 890, 895–96 (7th Cir.1988), show that it is proper to view this type of operation as a single, ongoing conspiracy. The question regarding variance is whether the defendants outside the core agreed to the core conspirators' objective. *Sophie*, 900 F.2d at 1081. Thus the question in this case boils down to this: Did Aquilla agree to supply cocaine to Guth's and Centracchio's ongoing multiple-kilogram cocaine distribution ring? In other words, did Aquilla join Centracchio's and Guth's agreement?

As noted, Aquilla argues that he did not become involved with Centracchio until after Centracchio and Guth had parted company. If this is so, Aquilla could not have agreed to supply cocaine to Centracchio's and Guth's distribution operation because Centracchio and Guth had no operation to agree to supply cocaine to. Any sales to Centracchio would have been, at best, the result of a new agreement with new goals. The government, on the other hand, argues that Aquilla joined the conspiracy no later than February 29, when he agreed to supply cocaine to Centracchio and Guth. If this is so, the fact that Guth later dropped out of the conspiracy does not matter, since the other conspirators can continue to carry out the conspiracy's goals. Cf. *Sophie*, 900 F.2d at 1082.

The evidence to support the government's theory is rather thin. The main—perhaps only—evidence on this point is Centracchio's taped statement to Lewellyn at the Rosebud Restaurant on March 1, 1988, that Aquilla had the night before agreed to supply cocaine to the Guth–Centracchio operation, and Lewellyn's testimony at trial about this statement. The government points to evidence that Aquilla supplied cocaine to Guth. It also points to evidence that Aquilla kept money he re-

ceived from Centracchio as payment for a cocaine debt owed by Guth and that on one occasion, when Aquilla was looking to sell some cocaine, he asked Centracchio if he had spoken to Guth or any of Centracchio's "other guys." However, this evidence is not especially probative of the scope of Aquilla's agreement with Centracchio and Guth. There is no question that shortly after the March 1 Rosebud meeting Guth and Centracchio went their separate ways. Centracchio even went so far as to tell Guth that he was "on his own" regarding any deals Guth might make with Aquilla. Thus, sales to Guth are not evidence of any agreement to supply the Guth–Centracchio operation. Moreover, there was no evidence of any multiple-kilogram sales to either Centracchio or Guth, or even any contemplated multiple-kilogram sales. Aquilla sold half-kilograms of cocaine to Lewellyn on two separate occasions, and perhaps sold some cocaine to Guth; this is not evidence of the type of ongoing, multiple-kilogram distribution conspiracy charged in the indictment.

Still, Centracchio did state to Lewellyn that Aquilla had agreed to supply the Guth–Centracchio operation. Centracchio himself did not make this statement in the courtroom; it was related at trial by tape and by Lewellyn's testimony. Is this hearsay statement (assuming it is admissible under Fed.R.Evid. 801(d)(2)(E)) sufficient by itself to sustain Aquilla's conspiracy conviction? Whether a co-conspirator's out-of-court statement is sufficient by itself to support a conviction is a question this court has left open on at least two occasions. See *United States v. Martinez de Ortiz*, 907 F.2d 629, 632 (7th Cir.1990) (en banc); *United States v. Thompson*, 944 F.2d 1331, 1341 (7th Cir.1991). In *United States v. Nichols*, 910 F.2d 419, 421 (7th Cir.1990), we stated in dictum that a co-conspirator's out-of-court statement is not sufficient by itself to support a conspiracy conviction. See also *de Ortiz*, 907 F.2d at 639 (Cudahy, J., dissenting).

We do not have to decide whether Centracchio's out-of-court statement alone was sufficient to support Aquilla's conspiracy. Nor do we have to decide whether the

other evidence the government has cited sufficiently corroborates the statement to support Aquilla's conspiracy conviction. Even if there was not sufficient evidence to support a finding that Aquilla joined the conspiracy alleged in the indictment, there was at least sufficient evidence to show that Aquilla conspired with Centracchio to distribute cocaine to Lewellyn. The conspiracy charge in the indictment encompassed this narrower conspiracy; therefore, we may uphold Aquilla's conspiracy conviction on this ground so long as the variance between the indictment and proof did not prejudice Aquilla. See *United States v. Wozniak*, 781 F.2d 95, 97 (7th Cir.1985); *Townsend*, 924 F.2d at 1390.

Aquilla protests the conclusion that he conspired with Centracchio, claiming that the evidence showed he did nothing more than sell cocaine to Centracchio. "[E]vidence of a buyer-seller relationship, standing alone, is insufficient to support a conspiracy conviction." *Townsend*, 924 F.2d at 1394. However, Aquilla did more than just sell cocaine to Centracchio; he cooperated with Centracchio in a joint effort to supply drugs to Lewellyn. That takes this case outside the buyer-seller rule. See *id.* (citing *United States v. Manzella*, 791 F.2d 1263, 1265 (7th Cir.1986)) ("when an agreement requires something more than the simple exchange of drugs for money, such as *obtaining* drugs for distribution" conspiracy liability may be appropriate). As the government notes, Aquilla had cocaine and Centracchio had a buyer. Only the combination between the two made the sales to Lewellyn possible. That is the reason the law makes such combinations—that is, conspiracies—illegal: such combinations make more likely the successful accomplishment of a criminal purpose. See *id.* at 1394.

This leaves the question of prejudice. A variance is cause for reversal only if the defendant shows that the variance prejudiced him. *Id.* at 1390. Aquilla did not show this in his opening brief for the simple reason that he did not raise the issue. He does attempt to demonstrate

prejudice in his reply brief, but that is too late. *Egert v. Connecticut General Life Ins. Co.*, 900 F.2d 1032, 1035 (7th Cir.1990). Therefore, the government is correct in asserting that Aquilla has waived the issue of prejudice. Cf. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991) (where district court's error is reversible only if it actually prejudiced defendant, defendant waives the error if he does not argue prejudice in his opening brief).

 In any event, we do not think that Aquilla has shown the variance prejudiced him. A variance between indictment and proof may prejudice a defendant in several ways: it may cause surprise which hinders the defendant's ability to defend himself; it may cause the possibility of subsequent prosecution for the same offense; it may cause jury confusion; it may allow the introduction of otherwise inadmissible hearsay evidence against the defendant under the co-conspirator exception to the hearsay rule; and it may lead to an increased sentence based on drug-related activities of others with whom the defendant did not conspire. See *Townsend*, 924 F.2d at 1410–11. Aquilla does not argue surprise, or any possibility of subsequent prosecution. The variance did not cause any increase in Aquilla's sentence because the district court held Aquilla accountable at sentencing only for the kilogram of cocaine he distributed to Lewellyn. The danger of jury confusion, or "spillover" prejudice was slight in this case for two reasons. First, Aquilla was tried alone, so the jury did not have to sort out the evidence directed at different defendants. Second, it is unlikely that the jury held the multiple-kilogram deals between Martinez, Guth, and Centracchio against Aquilla because the evidence was clear that Aquilla had nothing to do with those transactions.

Aquilla does argue that the jury heard "much evidence" that would have been inadmissible absent the indictment's broad conspiracy charge. However, he does not point us to specific examples of this evidence, explain exactly why all or any of it would not have been admissible, or explain in much detail exactly why it prejudiced

him. Aquilla does argue that evidence that Centracchio was a drug dealer and had been involved in multiple-kilogram deals with Martinez bolstered his testimony regarding Aquilla. Almost all of this evidence came either from Centracchio himself (by way of tape-recorded conversations he had with Lewellyn) or Lewellyn. But it was not likely that this testimony would bolster their own testimony about Aquilla. If the jury found that Centracchio and Lewellyn testified credibly about their early dealings, why would they not also find Centracchio and Lewellyn testified credibly about Aquilla's activities? In any event, Aquilla was taped at least once on November 10, 1988 attempting to set up a half-kilogram cocaine deal with Centracchio. (As we have already noted, the context of the conversation made it unlikely that the conversation was not about drugs.) He was also identified by an FBI agent as being at the scene of the May 10 deal with Centracchio while the deal was going on. Given all this, Aquilla has not shown that it was likely that any inadmissible evidence that might have been introduced at trial swayed the jury to reach a verdict it would otherwise not have reached.

### III.

Aquilla also appeals his sentence, arguing that the district court should have reduced his offense level by two levels because he accepted responsibility for his crimes. See U.S.S.G. § 3E1.1. The district court denied the acceptance of responsibility reduction, based primarily on Aquilla's failure to acknowledge his participation in the May 10, 1988 cocaine sale. (See Sentencing Tr. 211.) Aquilla does not state that he actually ever did acknowledge his participation in the May 10 sale; however, he argues that we must remand for a new determination regarding acceptance of responsibility because the district court's finding on the issue was tainted by the ineffective assistance he received from his counsel at sentencing.

To establish ineffective assistance of counsel, Aquilla must show that his counsel's performance was deficient as mea-

sured against "an objective standard of reasonableness" based on "prevailing professional norms." *Strickland v. Washington,* 466 U.S. 668, 687–91, 104 S.Ct. 2052, 2064–66, 80 L.Ed.2d 674 (1984). In determining whether counsel's performance was deficient, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment." *Id.* at 689, 104 S.Ct. at 2065. Besides showing deficient performance, Aquilla must also show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

■■■ Direct appeal is not often the best time to raise an ineffective assistance claim because such claims often require factual findings about counsel's performance that this court is ill-equipped to make. A better route for a defendant making an ineffective assistance claim is to raise the issue in the district court either in a new trial motion, see Fed.R.Crim.P. 33, or in a proceeding for collateral relief under 28 U.S.C. § 2255. See *United States v. Reiswitz,* 941 F.2d 488, 495 (7th Cir.1991). "However, we have the discretion to resolve an attorney incompetence issue when, as here, both parties ask us to resolve the matter, the question has been briefed and argued, and we have the entire [sentencing] record before us." *Id.*

■■■ The sentencing transcript reveals that Aquilla's sentencing counsel provided yeoman assistance. She vigorously, and successfully, contested the government's request for a two-point enhancement for obstructing justice. She convinced the court that Aquilla's criminal history category should be I rather than II. The record reveals overall that Aquilla's sentencing counsel was well prepared for her task. This does not satisfy Aquilla, however. He contends that counsel's performance was deficient in two respects: she erroneously (according to Aquilla) advised Aquilla not to present his version of the offense to the probation officer preparing his presentence

report; and she allegedly failed to make a proper record of Aquilla's cooperation with the government after his conviction.

We do not need to examine in detail whether Aquilla has overcome the strong presumption that his sentencing attorney's representation was reasonable (although our review of the record leads us to conclude he has not) because it is clear that Aquilla has not shown that but for his attorney's alleged mistakes the result would have been different. Almost the entire sentencing record cuts against an acceptance of responsibility reduction.

■■■ As a general rule, the acceptance of responsibility adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, Application Note 2; see *United States v. Agrell,* 965 F.2d 222, 228 (7th Cir.1992). That is the case here. In fact, Aquilla did not just challenge his guilt at trial; he likely committed perjury when he testified at trial that he never sold any cocaine. Even after trial, Aquilla continued to deny any involvement in the May 10, 1988 sale until after the district court cited his denial of involvement in that sale as its reason for denying the acceptance of responsibility reduction.

Aquilla did give a statement immediately before he was sentenced. But that statement showed little in the way of accepting responsibility. Aquilla admitted only that he was involved "in this thing" "to a great extent." He then gave an excuse for his conduct: "I got involved and mixed up with the wrong people and trying to help them financially." Aquilla's grudging and incomplete admission, accompanied by an excuse to minimize his own culpability, does not indicate acceptance of responsibility.

In light of this record, it is not likely that the mistakes Aquilla alleges his attorney made had any effect on the district court's decision regarding acceptance of responsibility. Aquilla has not even told us what he would have told the probation officer about his drug dealing if he had given his

own version of the offense; given his consistent denial of any involvement in the May 10 sale, it is likely he would have denied his involvement to the probation officer. As for any lack of record concerning Aquilla's cooperation, what record we do have shows that his cooperation was motivated solely by self-interest, not contrition. According to Aquilla, he cooperated "for the strict purpose of helping myself out of a jam that I felt I was wrongly brought into...." This type of self-interested cooperation does not indicate acceptance of responsibility. See *United States v. Charria*, 919 F.2d 842, 849 (2d Cir.1990).

Besides complaining about his attorney's representation at sentencing, Aquilla complains that he was effectively denied his right to allocution guaranteed by Fed. R.Crim.P. 32(a)(1)(C) because he was unable to address the court until after it had made its finding regarding acceptance of responsibility. Aquilla complains that by being allowed to allocute only after the court had made its acceptance decision, he was unable to influence that decision by the statement he made and his demeanor as he made the statement. He also argues that he might have made a different statement had the acceptance question still been open. But this ignores that until the court actually imposes sentence, it is free to re-evaluate and change its factual findings. If a defendant makes a particularly persuasive allocution, the court could decide that he has accepted responsibility after all. Moreover, Aquilla's argument that he might have made a different statement earlier is ironic for someone who claims he has accepted responsibility for his conduct. One would suppose that a person who has accepted responsibility, who is truly contrite, would not tailor his statement to suit his own purposes; instead, he would make an honest admission of his deeds and let the sentencing chips fall where they may.

Aquilla's argument also is wrong factually. Although Aquilla did not give his final statement until immediately before the court pronounced sentence, he did have two earlier opportunities to address the court: when he testified in open court at the sentencing hearing; and when he freely addressed the court during a portion of the sentencing hearing held in chambers. At neither one of those times did Aquilla say anything that indicated he accepted responsibility for his crimes.

 In any event, Aquilla had no right to address the court at any particular time in the sentencing process, so long as the court gave him the opportunity to speak before it imposed sentence. Aquilla cites no cases holding that a defendant has a right to address the court before every important factual finding it makes. Rule 32(a)(1)(C) itself states only that, "[b]efore imposing sentence, the court shall ... address the defendant personally and determine if the defendant wishes to make a statement and to present any information in mitigation of the sentence." The court complied with this mandate; Aquilla was entitled to no more.

For the reasons set forth above, Aquilla's conviction and sentence are

AFFIRMED.