In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3543

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TEOVONNI CUNNINGHAM,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:14-cr-50038-2 — **Philip G. Reinhard**, *Judge.*

ARGUED OCTOBER 26, 2017 — DECIDED FEBRUARY 21, 2018

Before FLAUM, RIPPLE, and MANION, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Teovonni Cunningham pleaded
guilty to one count of conspiracy to possess stolen firearms
and ammunition, in violation of 18 U.S.C. §§ 371 and 922(j);
one count of possession of stolen firearms and ammunition,
in violation of § 922(j); and one count of possession of firearms
by a felon, in violation of § 922(g)(1). The district court sen-
tenced him to 60 months on the conspiracy count, 12 months

on the § 922(j) count, and 116 months on the felon-in-possession count, all to run consecutively; his total sentence, therefore, was 188 months' imprisonment.[1] Mr. Cunningham appeals his sentence, contending that the district court's limitation on his presentation of character witness testimony at sentencing violated Federal Rule of Criminal Procedure 32(i)(4)(A)(ii) and that the resulting sentence is substantively unreasonable.[2]

We affirm the judgment of the district court. Federal Rule of Criminal Procedure 32(i)(4)(A)(ii) does not govern the calling of character witnesses at sentencing, and the district court did not abuse its discretion in its consideration of Mr. Cunningham's mitigation evidence. The sentence imposed was the product of the district court's careful and compassionate consideration of all the evidence in this very difficult sentencing situation. Accordingly, we affirm its judgment.

# I

## BACKGROUND

In December 2012, Michael Schaffer learned that an acquaintance, G.W., kept a private collection of firearms, ammunition, and accessories in his home in Rockton, Illinois. Schaffer showed Mr. Cunningham where G.W. lived and

---

[1] The jurisdiction of the district court was premised on 18 U.S.C. § 3231.

[2] Our jurisdiction is premised on 28 U.S.C. § 1291, and 18 U.S.C. § 3742.

where he kept the weapons. Schaffer also told Mr. Cunningham that G.W. and his family would be away from the home for a period on December 31, 2012. Mr. Cunningham and a third accomplice, Michael Tapia, agreed to break in and steal the collection. All three men—Schaffer, Tapia, and Mr. Cunningham—then agreed to store, sell, and otherwise dispose of the weapons.

Mr. Cunningham and Tapia later broke into G.W.'s home through a window and stole a total of twenty-two firearms along with ammunition. This stash included two semiautomatic firearms, which were in close proximity to magazines that could accept more than fifteen rounds of ammunition.[3] Four additional weapons were dropped in the house during the robbery.[4] Between January and August of the following year, Mr. Cunningham sold or disposed of five weapons and some ammunition to Schaffer and Darrell Reed.

The Government charged Mr. Cunningham, along with Tapia and Reed, in July 2014. Shortly after his arrest, the district court released him on bond. The conditions of release initially required him to remain on home detention except for employment, educational, legal, medical, or religious obligations and to remain within the Northern District of Illinois. The court later modified these conditions to allow him to travel outside of the district with his employer, to attend

---

[3] Specifically, they stole five handguns, four shotguns, an AR-15 rifle, a FN SCAR 16S rifle, and eleven other rifles, along with 475 rounds of .223 caliber ammunition and five AR-15 thirty-round magazines.

[4] The dropped weapons increase the total number of involved weapons to more than twenty-five, which resulted in an additional increase in offense level at sentencing.

school events for his daughters, and to travel to a medical appointment with one of his daughters.

He and his codefendants, now including Schaffer, subsequently were charged in a five-count superseding indictment. Mr. Cunningham pleaded guilty to counts 1 through 3, possession by a felon, possession of stolen firearms, and conspiracy. His written plea included the factual basis for the offense.

The Probation Office prepared a presentence investigation report ("PSR"). The report determined that Mr. Cunningham's offense involved a semiautomatic firearm capable of accepting a large capacity magazine and concluded that his prior felony constituted a crime of violence.[5] The report set his base offense level at 22.[6] Various enhancements substantially raised this base: more than twenty-five firearms were involved, resulting in a six-level increase;[7] firearms were stolen, resulting in a two-level increase;[8] the stolen firearms were trafficked, resulting in a four-level increase;[9] and the defendant used a firearm in connection with another felony offense,

---

[5] *See* U.S.S.G. § 4B1.2(a).

[6] *See id.* § 2K2.1(a)(3).

[7] *See id.* § 2K2.1(b)(1)(C).

[8] *See id.* § 2K2.1(b)(4)(A). The resulting level was reduced by one pursuant to 2K2.1(b), which states that the cumulative offense level from the application of (b)(1)–(4) may not exceed 29.

[9] *See id.* § 2K2.1(b)(5).

resulting in a four-level increase.[10] After a three-point reduction for acceptance of responsibility, the resulting total offense level was 34.

The calculation of Mr. Cunningham's criminal history also produced a very significant score. Prior criminal convictions, including a 2004 felony conviction for mob action in Illinois, a 2006 misdemeanor possession with intent to distribute cannabis, a 2013 misdemeanor theft, and a second mob action in 2014, resulted in 9 criminal history points. Consequently, the PSR calculated his criminal history category as IV. The advisory sentencing range therefore became 210–262 months.

The Government's sentencing memorandum disagreed with the PSR's base offense level. The Government contended that Mr. Cunningham's first mob-action offense was not a crime of violence under Illinois law, and thus that U.S.S.G. § 2K2.1(a)(3) was inapplicable. Instead, the Government believed that § 2K2.1(a)(4) provided the proper offense level, two levels lower than that recommended by the PSR. The Government therefore recommended an offense level calculation of 33,[11] and a sentencing range of 188–235 months' imprisonment. In proposing a sentence, the Government

---

[10] *See id.* § 2K2.1(b)(6) & cmt. n.14(B) (stating that when a defendant steals a firearm in a burglary, even if he does not use the firearm, the enhancement applies).

[11] Under U.S.S.G. § 2K2.1, the total offense level under sections (b)(1) through (b)(4) could not exceed 29. The PSR began with a base offense level of 22 and added 8 levels under those subsections, resulting in an offense level of 30, which was reduced to 29. The Government's calculation began from a base offense level of 20 and added the same 8 levels as the

pointed to multiple aggravating factors: the seriousness of the offense; at least three of the stolen weapons were recovered from known gang members in the community; and more than half of the weapons had not yet been recovered. The Government also noted that Mr. Cunningham had a prior affiliation with the Latin Kings gang and had two convictions for felony mob action based on personal attacks, one of which involved a shooting. In mitigation, the Government invited the court's attention to Mr. Cunningham's strong relationship with his daughters, his involvement in his church, and his clean record while on pretrial release. The Government requested a sentence within the revised guideline range.

Mr. Cunningham's sentencing memorandum agreed with the Government that mob action was not a crime of violence. In addition, he objected to two criminal history points because they were based on his being under a criminal justice sentence at the time of the instant offense; he noted that he was on bond and had not been convicted or sentenced in connection with that prior offense.[12] Beyond his claimed calculation errors, he also asked that the court impose a sentence below the advisory guidelines. He stressed the impact of a high sentence on

PSR. Because the total level was 28, no reduction was required. Accordingly, the two-level reduction in base offense recommended by the Government translated to only a one-level reduction in total offense level.

[12] *See* U.S.S.G. § 4A1.2(a)(1) (defining prior sentence); R.269 at 4–5 (Mr. Cunningham's objections to the PSR, contending that he was charged with, but had not been convicted of, another offense at the time he committed the offense of conviction). Nevertheless, the removal of 2 criminal history points from 9 to 7 had no effect on the criminal history category of IV, which covers the range of 7–9 criminal history points. *See* U.S.S.G. Ch. 5, Pt. A (Sentencing Table).

his family, his reliable and continued successful employment in his father-in-law's specialized paint company, and his other efforts at rehabilitation following his arrest. He also submitted thirty-seven pages containing more than twenty letters and various photographs from friends and family. These letters served as character references and asked for leniency in his sentence. His wife, Lisa Schwartz-Cunningham, submitted a lengthy letter describing their long-term relationship and happy marriage, Mr. Cunningham's contributions to the home, and his relationship to their three daughters, two of whom have health issues. Their nine-year-old daughter has a form of cerebral palsy, and their infant daughter had a congenital heart defect at birth. His father-in-law, Ronald Schwartz, wrote about Mr. Cunningham's positive involvement in the family business, his good work ethic, and Mr. Schwartz's hope to leave the business to Mr. Cunningham upon his retirement.

At the outset of the sentencing hearing, the court noted that it had received and reviewed the written materials and asked the parties if they had any additional materials for consideration. The Government stated that it had nothing further, and counsel for Mr. Cunningham stated that there was nothing further "[o]ther than our witnesses."[13] The court responded that it would "get to that in a moment."[14] The court then went through the PSR and the parties' objections and, after agreeing that mob action was not a crime of violence, arrived at a total offense level of 33 and a criminal history category of IV. These calculations resulted in a guidelines range

---

[13] R.307 at 3.

[14] *Id.*

of 188–235 months' imprisonment, consistent with the Government's recommendation. After addressing issues related to restitution and the terms of supervised release, the court began:

> THE COURT: All right. Now, Mr. Richardson, you indicated that you might have witnesses?
>
> MR. RICHARDSON: Yes.
>
> THE COURT: We don't usually have that because I have letters that you submitted, which I have read, and so I'm telling you normally that the lawyers who practice out here do not present witnesses.
>
> If you are—if your practice—I know you are from Chicago and it is a little bit different. I understand that. I might let you have a couple of witnesses testify just very briefly. If they have submitted letters already, I have read those.
>
> MR. RICHARDSON: I understand, your Honor. It is just—it is my client's life, and to see it on paper is one thing, to hear from live and in person is quite another.
>
> We have three witnesses. I don't imagine they would be terribly long, maybe five minutes or so apiece.
>
> THE COURT: All right. It shouldn't be that long. I will give you an opportunity to call them, but I just don't want them to repeat what they have got in their letters. They can tell me their

wishes for the defendant, but I would rather fo-
cus on your arguments and incorporate what
you have got and listen to what he has got to
say. I thought the letters were well written, and
I am impressed by them. So with that in mind—

MR. RICHARDSON: Your Honor, if I could
cut it down to two witnesses, the defendant's fa-
ther-in-law and his wife, that would probably
save some time. I think that those are the two
most important.

THE COURT: I understand. Cut it down.
You don't have to go through everything that
they have gone through. I think the wife wrote
over a three-page letter, and I have read it. I was
impressed with it.[15]

Counsel called Mr. Cunningham's father-in-law,
Mr. Schwartz, and then his wife, and both testified at some
length about the positive changes Mr. Cunningham had made
and about the impact of his incarceration on his family and
children. Mr. Schwartz also described Mr. Cunningham as a
model employee who had learned a trade, had been an excel-
lent supervisor, and would eventually run the business.
Mrs. Schwartz-Cunningham spoke principally about her hus-
band's involved parenting and his relationship with his
daughters. As Mrs. Schwartz-Cunningham spoke about her
fears for her children if Mr. Cunningham were sentenced to a
long prison term, the court interjected, "If you could wrap it

---

[15] *Id.* at 21–22.

up. It is emotionally very hard."[16] The court also allowed Mr. Cunningham's pastor to speak on his behalf, although he reminded counsel multiple times to be "[v]ery brief[]."[17] His pastor then spoke briefly about his baptism, as well as his attendance and assistance at church.

After this testimony, the court asked the parties for their final arguments and sentencing recommendations. The Government acknowledged that Mr. Cunningham's sentencing presented a difficult decision. The Government emphasized that the offense was a serious and dangerous one; as a result of Mr. Cunningham's conduct, more than ten weapons and a significant amount of ammunition, not recovered by law enforcement, could endanger other families. It acknowledged the defendant's successful pretrial release, his family situation, and the positive strides that he had made in the past two years. The Government also noted that although the advisory guidelines calculations were correct, Mr. Cunningham's actual conduct was at the lower end of the assigned category in two respects. First, Mr. Cunningham had received a six-level enhancement because the crime involved between twenty-five and one hundred weapons; his particular offense involved twenty-six. Similarly, he had the lowest criminal history score that could qualify him as a category IV offender. In the Government's view, this situation similarly counseled a sentence at the low end of the guidelines.

Mr. Cunningham's counsel emphasized Mr. Cunningham's troubled upbringing, his falling into a bad crowd, the health and other challenges faced by his children, and his

---

[16] *Id.* at 35.

[17] *Id.* at 36.

now-stable home. He noted that his father-in-law planned to turn over his painting business to Mr. Cunningham at his retirement in five or six years. He requested a below-guidelines sentence, which would allow him to inherit the business and allow the family to keep their home.

Mr. Cunningham offered his own brief statement in which he apologized for his offenses, spoke of his commitment to a changed life, and thanked the Government for the opportunity to be out of custody on pretrial release "to prove myself to society that I can function as an upstanding citizen and … provide for my family through this excruciating time."[18]

The court then explained its sentencing decision. It first noted that, despite the strides Mr. Cunningham had made, he had committed, nearly contemporaneous with this offense, a theft offense and another mob-action offense. Therefore, while enjoying a happy home life and a stable job, he still had engaged in a pattern of criminal behavior. The court then turned to the § 3553(a) factors. It noted that the offenses were very serious ones with significant aggravating factors, including that weapons still were on the street and had not been recovered by law enforcement. The court also characterized Mr. Cunningham's criminal history as significant and aggravated. The court concluded:

> So all in all, in looking at this case, I don't see any sentence that I can impose of imprisonment that would be less than the lower end of the guideline range. You would have faced, in my judgment, if you had been incarcerated and not had an opportunity to show yourself over the

---

[18] *Id.* at 53.

last two years, you would have had—you would have faced the high end of the guideline range based on your record.

The Court has given consideration to those two years you have spent without committing a crime, and I am going to sentence you at the low end of the guideline range, but I see no basis for a downward variance in this very serious crime. Accordingly, the Court is going to make the following sentence: You are convicted of three different offenses, and I am going to sentence you on Count 1 to 60 months in the Bureau of Prisons; I am going to sentence him on Count 2 to 12 months in the Bureau of Prisons, consecutive to that in Count [1]; and in Count 3, I'm going to sentence him to 116 months in the Bureau of Prisons, consecutive to that in Counts 2 and 1, and I'm going to recommend that he be designated to a Bureau of Prisons facility nearest Rockford so he can be close as possible to his family.

….

The Court, before it imposes the supervised release—if his wife or whoever is sobbing, if you want to step outside, you can. It is a little difficult for him to understand and to take, I would think, but do what you can.[19]

---

[19] *Id.* at 59–61.

Because his sentences were consecutive, the sentence im-
posed was 188 months, the low end of the guidelines range.
After imposing the conditions of supervised release, the court
added,

> All right. This has been a very difficult time,
> Mr. Cunningham, for you, for your family, for
> your friends. It has not been easy for me either.
> I have imposed a sentence that I think is appro-
> priate according to law. I encourage those who
> are here as his friends to visit him as often as
> possible and have his kids do that as well.
>
> You have—it is a long period of time. Things
> change. Sometimes the laws change. But it is up
> to you how you live your life, but try to live it in
> a positive way in the future. That's all.[20]

## II

## DISCUSSION

Mr. Cunningham asks that we consider two issues. He
first submits that the district court violated Federal Rule of
Criminal Procedure 32(i)(4)(A)(ii) when it curtailed the
presentation of witnesses at his sentencing hearing. He also
contends that the resulting sentence was substantively unrea-
sonable. We will consider these issues in turn.

---

[20] *Id.* at 65.

## A.

We first consider whether the district court violated Federal Rule of Criminal Procedure 32(i)(4)(A)(ii).[21]

Federal Rule of Criminal Procedure 32(i) governs the conduct of the sentencing hearing itself.[22] Mr. Cunningham

---

[21] At the outset, the parties dispute whether we ought to review this matter de novo or for plain error. According to Mr. Cunningham, "counsel made it absolutely clear that he was asserting his client's right to present mitigation evidence," while he also concedes that counsel at sentencing did not mention the relevant rule on which Mr. Cunningham relies on appeal. Reply Br. 3. The Government contends, however, that plain error is the appropriate standard. Our examination of the record convinces us that the Government has the better of this argument. Although trial defense counsel did assert that witnesses would assist the court and make a more pointed impact on the proceedings than would paper submissions, he also repeatedly stated that he would work with the court to make the testimony brief and relevant. Moreover, although counsel indicated that he had witnesses to present, he never claimed *a right* to present witnesses, with or without reference to Rule 32. In any event, our decision would be the same under either standard.

[22] The Rule reads, in full:

(i)  Sentencing.

(1) In General. At sentencing, the court:

(A) must verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the report;

(B) must give to the defendant and an attorney for the government a written summary of—or summarize in camera—any information excluded from the presentence report under Rule

32(d)(3) on which the court will rely in sentencing, and give them a reasonable opportunity to comment on that information;

(C) must allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence; and

(D) may, for good cause, allow a party to make a new objection at any time before sentence is imposed.

(2) Introducing Evidence; Producing a Statement. The court may permit the parties to introduce evidence on the objections. If a witness testifies at sentencing, Rule 26.2(a)–(d) and (f) applies. If a party fails to comply with a Rule 26.2 order to produce a witness's statement, the court must not consider that witness's testimony.

(3) Court Determinations. At sentencing, the court:

(A) may accept any undisputed portion of the presentence report as a finding of fact;

(B) must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing; and

(C) must append a copy of the court's determinations under this rule to any copy of the presentence report made available to the Bureau of Prisons.

(4) *Opportunity to Speak.*

grounds his argument in subsection 32(i)(4)(A)(ii). This subsection addresses the right of allocution and requires that the court "address the defendant personally in order to permit the defendant to speak *or present any information* to mitigate the sentence." *Id.* (emphasis added). In Mr. Cunningham's view, the italicized language contemplates not only allocution, but introduction of any other evidence he wishes to present.

We cannot accept this interpretation. The plain language of the rule, read in context, is not consistent with Mr. Cunningham's reading. First, this portion of the rule, entitled

---

(A) By a Party. Before imposing sentence, the court must:

(i) provide the defendant's attorney an opportunity to speak on the defendant's behalf;

(ii) *address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence*; and

(iii) provide an attorney for the government an opportunity to speak equivalent to that of the defendant's attorney.

(B) By a Victim. Before imposing sentence, the court must address any victim of the crime who is present at sentencing and must permit the victim to be reasonably heard.

(C) In Camera Proceedings. Upon a party's motion and for good cause, the court may hear in camera any statement made under Rule 32(i)(4).

Fed. R. Crim. P. 32(i) (emphasis added).

"Opportunity *to Speak*," identifies four classes of persons who must be afforded an opportunity *to speak*: counsel for each side, the defendant, and the victims. Mr. Cunningham unquestionably was offered and personally exercised that right at his hearing.

Mr. Cunningham's principal textual argument is that the rule allows the defendant himself to "speak *or present any information*," and that limiting the right to allocution alone specifically reads the latter phrase out of the rule. Although he is correct that there must be some content to that phrase, we believe it a significant and unjustified leap to interpret it as bestowing on the defendant the unfettered right to present personally the testimony of other witnesses. The rule speaks elsewhere about the introduction of *evidence*[23] and does not employ here the same term. Moreover, it indeed would be a radical departure from the overall text and manifest intent of the Rule to permit the *defendant personally*, not defendant's counsel, to introduce evidence.

Most fundamentally, the rule long has been understood to represent the traditional practice of allocution, a "personal" right to the defendant. *United States v. Luepke*, 495 F.3d 443, 449 (7th Cir. 2007). In *Luepke*, we stated that we had considered, "on numerous occasions, a defendant's right to allocute and to present evidence in mitigation." *Id.* (citing *United States v. Aquilla*, 976 F.2d 1044, 1054 (7th Cir. 1992), and *United States v. Barnes*, 948 F.2d 325, 330–31 (7th Cir. 1991)). Both cases we relied on referred to the right to speak personally rather than

---

[23] *See* Fed. R. Crim. P. 32(i)(2) ("Introducing Evidence; Producing a Statement. The court *may permit* the parties to introduce evidence *on the objections*." (emphasis added)).

any right to introduce other evidence, such as additional witness testimony. *See id.* As the Supreme Court has recognized, a defendant's opportunity to exercise this right is crucial because "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for *himself*." *Green v. United States*, 365 U.S. 301, 304 (1961) (plurality) (emphasis added).[24] The clause allowing the defendant the right to "present any information," read in this traditional context of *personal* presentation, simply makes clear that the defendant may do more than traditional allocution of admitting the offense and requesting mercy.[25] Mr. Cunningham did that here by inviting the attention of the court to his positive life changes.

---

[24] Indeed, in describing the history of the rule, the Supreme Court stated:

> The design of Rule 32[] did not begin with its promulgation; its legal provenance was the common-law right of allocution. As early as 1689, it was recognized that the court's failure to ask the defendant if he had anything to say before sentence was imposed required reversal. See Anonymous, 3 Mod. 265, 266, 87 Eng. Rep. 175 (K.B.). Taken in the context of its history, there can be little doubt that the drafters of [the present] Rule … intended that the defendant be personally afforded the opportunity to speak before imposition of sentence. … The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself.

*Green v. United States*, 365 U.S. 301, 304 (1961) (plurality).

[25] *See United States v. Barnes*, 948 F.2d 325, 328 (7th Cir. 1991) (describing the historical right as allowing the defendant an "opportunity to plead for mercy").

As the Government notes, no court has interpreted the rule cited by Mr. Cunningham as requiring the sentencing court to allow mitigation witnesses. Indeed, several of our sister circuits have made clear that the Rule contemplates no such right. *See, e.g.*, *United States v. Jones*, 643 F.3d 275, 277–78 (8th Cir. 2011) (concluding that the trial court's decision not to allow a character witness to testify did not violate Rule 32, where the defendant had an opportunity to speak and the court heard and considered a brief summary of the proffered character testimony); *United States v. Cruzado-Laureano*, 527 F.3d 231, 238 (1st Cir. 2008) ("Federal Rule of Criminal Procedure 32 does not give defendants the right to call witnesses in their behalf at sentencing. The rule only requires the court to allow the defendant and his attorney to speak."); *United States v. Claudio*, 44 F.3d 10, 16 (1st Cir. 1995) ("[T]here is no automatic right to present live testimony at sentencing … ."); *United States v. Heller*, 797 F.2d 41, 43 (1st Cir. 1986) ("Although the defendant must be given the chance to inform the court of any mitigating circumstances, he does not have the right to have others testify for him at a sentencing."); *United States v. Jackson*, 700 F.2d 181, 191 (5th Cir. 1983) ("Hicks argues that the requirement in Fed. R. Crim. P. 32(a)(1) that a defendant be given the opportunity to present information in mitigation of punishment gives him the right to present witnesses in his own behalf. … The defendant must be given the chance to inform the court of any mitigating circumstances, but we see little advantage to be gained by allowing the defendant to have others testify for him at sentencing. In fact, such a judicial extension of the right of allocution would amount to a trial of the defendant's character following the trial of his guilt.").

Mr. Cunningham notes that many of these cases can be distinguished because they involved claims that the defendant should have been allowed to introduce witnesses to reargue the issue of guilt rather than to establish good moral character. Although he is correct, the fact still remains that he has identified no case in which one of our sister circuits has held that Rule 32 provides *any right* to call witnesses in mitigation, for any purpose.[26]

The Rule and the cases therefore do not establish that the defendant has a right to present character witnesses in mitigation of sentence. In any event, as the Government correctly notes, Mr. Cunningham's counsel at sentencing said that he wished to present three live witnesses.[27] He did so *before* the court told him that its usual practice was not to permit live character witness testimony.[28] After the court stated that it was not typical to hear from witnesses, Mr. Cunningham's attorney elected to call all three identified witnesses anyway.

At best, then, Mr. Cunningham can assert only that the district court, by its emphasis on brevity of presentation, unreasonably curtailed the presentation of mitigation evidence. We have no doubt that a district court's insistence, especially repeated insistence, that the defense hurry its presentation of mitigation evidence, can produce a climate of discomfort in the courtroom that precipitates an unreasonable truncation or

---

[26] The right to present witnesses and other evidence in mitigation in *capital cases* is long established and of constitutional, rather than statutory, provenance. *See, e.g.*, *Paxton v. Ward*, 199 F.3d 1197, 1213–14 (10th Cir. 1999) (discussing the issue as involving the Due Process Clause).

[27] R.307 at 4.

[28] *Id.* at 21–22.

dilution of this important part, oftentimes *the* most important part, of the defendant's entire case. We also have no doubt that a district court's idiosyncratic insistence on its own way of proceeding, without the notice provided by local rules or standing orders, can often disadvantage counsel who does not frequently appear before that particular judicial officer. District courts have the obligation to ensure that neither of these barriers become significant obstacles in sentencing proceedings, the most solemn part of the criminal process. Should we encounter in a future case such barriers on defendants' rights, we will not hesitate to take appropriate action.

Because such concerns are implicit and explicit in Mr. Cunningham's submission to us, we have examined the record with great care and, as a result of that examination, we have concluded that no such adverse impact occurred.[29] Therefore, because neither the Rule nor our cases establish a right to the presentation of character *witnesses*, and because, on the record before us, the district court afforded Mr. Cunningham a full and fair opportunity to present his case, there is no reversible error.

**B.**

Mr. Cunningham also submits that the sentence imposed is substantively unreasonable. Notably, Mr. Cunningham expressly disclaims any argument that the district court committed procedural error by failing to address his principal arguments at sentencing. Indeed, he acknowledges that any

---

[29] The defendant's contention that his mother also might have testified is simply not sustainable. He never told the district court that he wanted his mother to testify.

such claim would be foreclosed by *United States v. Garcia-Segura*, 717 F.3d 566, 568–69 (7th Cir. 2013), where we held that a district court may avoid a procedural challenge to a sentence by asking defense counsel at sentencing whether it had addressed the defendant's principal arguments.[30]

Mr. Cunningham was sentenced at the bottom of the advisory guidelines range. As both parties acknowledge, a within-guidelines sentence is presumptively reasonable, and it is the defendant's burden to overcome the presumption. *United States v. Matthews*, 701 F.3d 1199, 1203 (7th Cir. 2012). Mr. Cunningham's argument on this point is essentially that the court gave insufficient weight to various mitigating factors under § 3553(a). However,

> Those factors, which are still mandatory after *Booker* (unlike the Sentencing Guidelines themselves), "are broad, vague, and open-ended," leaving the sentencing judge with "considerable discretion to individualize the sentence to the offense and offender as long as the judge's reasoning is consistent with § 3553(a)." *United States v. Wachowiak*, 496 F.3d 744, 748 (7th Cir. 2007). Thus, under the deferential abuse-of-discretion standard, the mere fact that we might have chosen a different sentence in the first instance is insufficient for reversal.

---

[30] Reply Br. 12–13. The court did so in this case. *See* R.307 at 64 ("[I]s there anything in terms of your argument that I have failed to address? I know you disagree with the sentence, but is there anything that I haven't addressed?").

*United States v. Jackson*, 547 F.3d 786, 792 (7th Cir. 2008). "We will uphold [a] sentence so long as the district court offered an adequate statement of its reasons, consistent with 18 U.S.C. § 3553(a), for imposing such a sentence." *United States v. Melendez*, 819 F.3d 1006, 1013 (7th Cir. 2016) (quoting *United States v. Annoreno*, 713 F.3d 352, 359 (7th Cir. 2013) (alteration in original)). The weight assigned by the district court to the § 3553(a) factors is a matter largely within that court's discretion. *Id.* "True, the weighting of th[ose] … factors must fall within the bounds of reason, but those bounds are wide." *Id.* (quoting *United States v. Smith*, 721 F.3d 904, 908 (7th Cir. 2013)).

Our examination of the record convinces us that the district court adequately considered the § 3553(a) factors, and we find no abuse of discretion in the court's weighing of those factors to arrive at its ultimate sentence. The court first focused on Mr. Cunningham's criminal record, calling it "significant" and "aggravated."[31] It also considered the seriousness and community impact of the present offense.[32] The court took into account, without prompting from counsel, any potential for sentencing disparities with codefendants in the present case and indicated that it would be carefully reviewing recommendations for lower sentences for other individuals involved in the same offense. The court also stated that it was concerned that the present offense was "an extension of what you had done" before, despite "the opportunity to earn

---

[31] R.307 at 57, 58.

[32] The court expressed deep concern about his provision of numerous weapons to local gang members and that more than ten weapons remained unrecovered by police.

a living, to have a family."[33] "[Y]ou alone are responsible for the predicament that you have put [your family] in, and that's your decision."[34]

Mr. Cunningham quite rightly stresses that he made positive life changes while on pretrial release, that his family needs his financial and emotional support, and that he has support and opportunities available to him that are not common to many criminal defendants. The record makes clear, however, that the district court gave serious consideration to Mr. Cunningham's good behavior while on pretrial release but that, when weighed against his criminal record and its impact on the community, his recent behavior did not justify going below the low end of the guidelines range. The district court's scrutiny of Mr. Cunningham's recent behavior was far more than cursory. Indeed, the court stated that, if it had been required to make a sentencing decision on the basis of his record presented at the time of pretrial release, the court would have imposed a sentence at the high end of the guidelines range; it was Mr. Cunningham's improvements during the pretrial release period that warranted a substantially reduced sentence.[35] Notably, the court pointed out that, despite his assertions that his family had changed him for the better, he had committed this and other offenses when his family and employment circumstances were both happy and stable.

The sentence is significant, but the court justified it carefully. The court's determination was tailored with precision

---

[33] *Id.* at 59.

[34] *Id.*

[35] *Id.* at 59–60.

to Mr. Cunningham's personal circumstances, to the seriousness of the crime, and to its impact on community safety. It is a substantively reasonable sentence.

## Conclusion

Mr. Cunningham was not denied the procedural safeguards set forth in Federal Rule of Criminal Procedure 32(i)(4)(A)(ii). There is no basis for saying that a defendant's personal right of allocution requires the district court to allow character witnesses to testify on a defendant's behalf. Moreover, the court did hear the proffered witnesses in addition to the substantial written evidence Mr. Cunningham submitted on the same points. Nor can we say, on the record before us, that the district court's handling of sentencing created a coercive or intimidating atmosphere inimical to a full and fair examination of the statutory sentencing factors. Mr. Cunningham's low-end guidelines sentence is presumed reasonable, and the district court conscientiously considered the § 3553(a) factors in crafting it. The evidence of record supports firmly the court's decision. Accordingly, the judgment of the district court is affirmed.

AFFIRMED