In the

# United States Court of Appeals
## for the Seventh Circuit

No. 23-1595

MICHAEL J. CONNOR,

*Petitioner-Appellant*,

*v.*

BRITTANY GREENE,[*]

*Respondent-Appellee*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 20-CV-1126 — **Colin S. Bruce**, *Judge*.

ARGUED DECEMBER 8, 2023 — DECIDED MARCH 3, 2026

Before RIPPLE, ROVNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Michael Connor was convicted in 2013 of five counts of predatory criminal sexual assault of a child following a bench trial in Livingston County, Illinois. The assaults occurred from 2008 to 2011 when the victims— his daughter and stepdaughter—were between five and

---

[*] We have substituted Brittany Greene, Connor's present warden, as the respondent, replacing Anthony Willis. *See* FED. R. APP. P. 43(c)(2).

seven years old. The penalty for this offense is 6 to 60 years in prison, and sentences for multiple convictions must be served consecutively. The penalty increases, however, to a mandatory term of life in prison when the offender is convicted of assaulting more than one child. The trial judge sentenced Connor to the mandatory life term.

After an unsuccessful direct appeal, Connor sought post-conviction relief in state court. With the assistance of new counsel, he claimed that his trial attorney's performance at the plea-bargaining stage was constitutionally ineffective. More specifically, he alleged that his counsel had failed to inform him that he faced a mandatory life sentence if convicted of assaulting both victims. That omission, he claimed, led him to reject an offer from the prosecutor of an 18-year sentence if he pleaded guilty.

At a hearing on the petition, Connor testified that he would have accepted the plea offer had his attorney advised him about the possible mandatory life sentence. The trial judge rejected his testimony as incredible because Connor had steadfastly maintained his innocence throughout the proceedings—including at sentencing when he professed his innocence and declared unequivocally that he would not have pleaded guilty to get a lesser sentence even if he had known the outcome of the trial. The judge therefore denied postconviction relief, ruling that Connor failed to show a reasonable probability that he would have pleaded guilty but for counsel's performance. The Illinois Appellate Court affirmed.

Connor petitioned for federal habeas review under 28 U.S.C. § 2254. The district judge denied relief. He was right to do so. A state court's factual findings are presumed correct on federal habeas review and may not be disturbed unless the

state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Credibility findings are entitled to particularly great deference. The state court found Connor's testimony unbelievable because it flatly contradicted unambiguous statements he had made earlier in the case. That negative credibility finding is both presumptively correct and well supported by the record. Connor has not clearly and convincingly rebutted it. We affirm the judgment.

## I. Background

Michael Connor and Amanda Garcia have two daughters: La.C., born in 2004, and Le.C., born in 2006. Michael, Amanda, and their daughters lived together from 2004 to 2010. Garcia has another daughter from a prior relationship, Z.T., born in 2003, who also lived with them.

The couple split up in 2010. In August 2011 Garcia took La.C. to a counselor because she had expressed thoughts of homicide and death. The counselor asked Garcia if La.C. had ever been sexually abused. Garcia did not think so at first but soon started suspecting that Connor may have sexually abused the girls. She called the police to report her suspicions, and a forensic interviewer met with all three children.

A few days later, the Livingston County State's Attorney charged Connor with five counts of predatory criminal sexual assault of a child in violation of chapter 720, section 5/12-14.1 of the 2010 Illinois Compiled Statutes.[1] The counts were grouped by victim and charged in two separate charging documents—three counts for assaults against Z.T. between 2008

---

[1] The offense has since been recodified at chapter 720, section 5/11-1.40 of the Illinois Compiled Statutes. We refer to the 2010 statutes.

and 2009, and two counts for assaults against La.C. between 2010 and 2011.

Each charging document correctly listed the penalty for the offense: 6 to 60 years in prison. 720 ILL. COMP. STAT. 5/12-14.1(b)(1). Sentences for multiple convictions must run consecutively, 730 ILL. COMP. STAT. 5/5-8-4(d)(2), and the penalty increases to a mandatory term of life in prison if the offender is convicted of assaulting two or more victims, 720 ILL. COMP. STAT. 5/12-14.1(b)(1.2). Neither charging document specifically mentioned the mandatory life term—probably because the counts involving each victim were charged in separate instruments. Still, the penalty enhancement is contained within the statute creating the crime, and the charging documents correctly listed that statute.

Though the counts against each victim were separately charged, the cases proceeded together. At arraignment the prosecutor correctly announced the penalty for this crime as 6 to 60 years, with the sentences to run consecutively. The prosecutor repeated this warning at the preliminary hearing, and the judge added this explanation: "That means you are facing six to 60 in one case. That would be served. And then another six to 60 in another case." Connor indicated that he understood and had no questions about the range of penalties he faced. The judge did not, however, mention the mandatory life sentence if Connor was convicted of assaulting both victims.

Connor maintained his innocence throughout the proceedings. He waived his right to a jury trial, and in 2013 the charges were tried to the court. The prosecutor presented testimony from Z.T. and La.C. and introduced their videotaped interviews. The prosecution's case also included testimony

from a nurse who examined the girls in November 2011, a few months after the charges were issued. The nurse found no visible signs of abuse, but she testified that La.C., who was just six years old when the examination occurred, tested positive for chlamydia, a sexually transmitted disease.

Connor testified in his own defense, telling the court that his relationship with Garcia deteriorated in August 2011, shortly before the charges were issued. He theorized that Garcia had coached the children into making the accusations against him.

The judge found Connor guilty on all counts. Immediately after the verdict, the prosecutor asked the court to revoke Connor's bond, noting that the convictions carried a mandatory term of life in prison. The judge granted the motion and revoked Connor's bond. Connor filed several posttrial motions, including one for a new trial. Among other claims, he argued that the judge's failure to advise him of the possible mandatory life sentence violated his right to due process. The judge denied the motion.

At sentencing Connor continued to assert his innocence, saying this during his allocution:

> I told the truth, and yet I stand here facing sentencing for a crime I didn't commit. … The thing [is,] even if I had known the outcome of a guilty verdict in this[,] I still would have not changed my plea because simply I cannot bring myself to admit to something I just didn't do just to get a lesser sentence.

The judge sentenced Connor to a 30-year prison term on one count involving Z.T. and the mandatory life term on one

count involving La.C. The remaining counts were merged into the judgment. The Illinois Appellate Court affirmed on direct appeal.

Through new counsel, Connor petitioned for state post-conviction relief, raising a Sixth Amendment claim for violation of his right to the effective assistance of trial counsel. As relevant here, he challenged his attorney's performance at the plea-bargaining stage of the case. He claimed that his counsel failed to tell him about the possible mandatory life sentence. He further alleged that the prosecutor had offered an 18-year sentence if he pleaded guilty and that he would have accepted the offer had his counsel properly advised him.

The trial judge held an evidentiary hearing on the petition, at which Connor and his mother testified. Connor told the judge that at no time before trial did his attorney advise him that he faced a mandatory life sentence. He further testified that he and his parents met with his attorney to discuss the prosecutor's 18-year plea offer, and his attorney told him he faced a sentencing range of 6 to 30 years in prison, of which he would serve 85 percent. (Recall that the statutory maximum for this crime is 60 years, not 30.) His attorney made no mention of the mandatory life sentence. Connor testified that he then discussed the plea offer with his family, and they agreed that because he was a first-time offender, any sentence would likely fall at the low end of the range of 6 to 30 years—at most, 12 years in prison—so the 18-year plea offer seemed too high. With their support, he rejected the plea bargain.

Connor's postconviction attorney asked him if he would have accepted the 18-year plea deal if his attorney had advised him about the mandatory life sentence. Connor replied that he would have taken the deal even though he was

innocent, saying: "I wouldn't have gambled with my life on it. Even innocent, you know, you go for life you will never see anything again."

Connor's postconviction counsel also asked him to explain his statement at the sentencing hearing when he told the judge that he would not have changed his plea to get a lesser sentence even if he knew he would be found guilty at trial. Connor said that when he prepared that statement before sentencing, he was "under the assumption that I was doing six to 30. I didn't know about the life until I came to sentencing." When he found out about the mandatory life sentence at the sentencing hearing, he "just kind of stuck to" what he had written because he was nervous. On cross-examination Connor said he was confident in his innocence and believed he had a strong defense.

Connor's mother similarly testified that her son's trial lawyer did not mention the mandatory life sentence during the meeting to discuss the plea offer. She also testified that if she had known that her son faced a life sentence, she would have recommended that he accept the 18-year plea deal. She conceded on cross-examination that Connor had continuously professed his innocence, never expressing a willingness to plead guilty.

Connor's trial attorney did not testify. Nor did Connor provide any details about the plea offer. He did not explain, for example, which assaults he would have admitted, how the proposed 18-year sentence would be structured, or whether the plea deal could have been presented to the court in a way that the judge would find acceptable.

The judge denied the postconviction petition, assuming for the sake of argument that trial counsel's performance had been deficient and holding that Connor had failed to prove prejudice. To prevail on a Sixth Amendment claim of ineffective assistance of counsel in the plea-bargaining context, the defendant must establish a reasonable probability that he would have pleaded guilty but for counsel's deficient performance. *Missouri v. Frye*, 566 U.S. 134, 147 (2012). The judge held that Connor had not made this showing. She expressly rejected his postconviction testimony, finding that he "was not a credible witness" and "seemed to be saying what he needed to say or more accurately [seemed to be] answering his attorney's questions as he needed to." The judge also explained that Connor's testimony squarely contradicted other evidence in the record—notably his own unambiguous declaration at sentencing that he was innocent and would not have pleaded guilty to get a lesser sentence even if he had known that he would be convicted at trial.

The judge rejected Connor's effort to explain away this statement. He testified in the postconviction proceeding that he did not mean what he said in allocution because he did not learn about the mandatory life sentence until the sentencing hearing and simply stuck to his prepared remarks. Yet in his motion for a new trial—filed more than four months before sentencing—he argued that he should receive a new trial because the judge had not advised him of the possibility of a mandatory life sentence. So he knew about the mandatory life sentence well before sentencing, contrary to his claim in his postconviction testimony.

Finally, the judge noted that Connor "was advised on more than one occasion that he faced a sentencing range of

6 to 60 years on each case and the sentences would run consecutive to each other." Assuming he received a sentence in the middle of each range, that meant he faced a de facto life sentence:

> For all practical purposes, [Connor] was well aware [when he rejected the plea deal] there was a very real and likely possibility that given the consecutive sentences, he could spend the rest of his life in prison.
>
> …
>
> [He] was willing to risk what would effectively be a life sentence … rather than plead guilty in exchange for an 18-year sentence.

Accordingly, the judge concluded that Connor had failed to prove prejudice because he had not shown a reasonable probability that he would have pleaded guilty but for his counsel's deficient performance.

The Illinois Appellate Court affirmed, accepting the judge's credibility findings and agreeing that the record contradicted Connor's postconviction testimony for essentially the same reasons. The appellate court added some analysis of its own. Connor had claimed at his postconviction hearing that he thought he faced a prison term of 6 to 30 years based on his meeting with his attorney about the plea offer. The court noted that this claim was contradicted by the charging documents, both of which listed the correct term of 6 to 60 years, as well as the record, which confirmed that Connor had been advised at several hearings that he faced 6 to 60 years.

The appellate court noted the obvious disparity between the 18-year plea offer and a life sentence; the court also acknowledged that a *discretionary* de facto life sentence is not the same as a *mandatory* life sentence. The court reasoned, however, that the disparity could not overcome Connor's continuous insistence that he was innocent, his belief that he had a strong defense, and his firm declaration at sentencing that he would not have pleaded guilty even if he had known the outcome of trial. Applying the general framework of *Strickland v. Washington*, 466 U.S. 668 (1984), and the specific requirements of *Frye*, the appellate court held that Connor had not shown that he would have pleaded guilty but for his counsel's deficient performance. The Illinois Supreme Court declined review.

Connor then turned to federal court with a petition for habeas review under § 2254. Because the state courts had correctly cited and reasonably applied the legal standards in *Strickland* and *Frye*, Connor's petition turned entirely on § 2254(d)(2), which permits federal habeas relief only if the applicant establishes that the state court's decision was based on an unreasonable determination of the facts.

Importantly here, the habeas statute implements this already deferential standard of review with yet another layer of deference. Under § 2254(e)(1), a state court's factual findings are presumed correct, and the applicant must rebut the presumption by clear and convincing evidence.

The district judge denied Connor's § 2254 petition, concluding that he had not met his burden to rebut the presumption. But the judge authorized an appeal, *see* 28 U.S.C. § 2253(c)(2), finding that reasonable jurists could disagree about whether the disparity between the 18-year plea offer

and a mandatory life sentence is enough to overcome the state court's negative credibility finding.

## II. Discussion

Federal collateral review of state criminal judgments is highly deferential: a federal court may not grant habeas relief from a state criminal judgment unless the state court's decision (1) was "contrary to" or "an unreasonable application of" clearly established federal law, § 2254(d)(1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). These steep standards of review "were designed to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under law." *Dassey v. Dittmann*, 877 F.3d 297, 301 (7th Cir. 2017) (en banc) (quotation marks omitted). We review a district judge's decision denying relief de novo and focus our attention on the "last reasoned state court decision to decide the merits of the case." *Pierce v. Vanihel*, 93 F.4th 1036, 1044 (7th Cir. 2024).

Connor's habeas claim rests on § 2254(d)(2): he focuses solely on the state courts' factual findings. That means he faces the additional hurdle of § 2254(e)(1), which as we've noted applies a presumption of correctness to a state court's factual findings—a presumption that can be overcome only by clear and convincing evidence. And because Connor asks us to disturb a state-court credibility finding, his burden is heavier still. On federal habeas review, we give "great deference" to the state court's credibility determinations, *Gambaiani v. Greene*, 137 F.4th 627, 640 (7th Cir. 2025), which "are notoriously difficult to overturn," *Sanders v. Radtke*, 48 F.4th 502, 511 (7th Cir. 2022) (quotation marks omitted).

Under these standards of review, "federal habeas relief from state convictions is rare." *Dassey*, 877 F.3d at 302. "It is reserved for those relatively uncommon cases in which state courts veer well outside the channels of reasonable decision-making about federal constitutional claims." *Id.*

The merits legal standard under *Strickland* is also highly deferential. A defendant raising a Sixth Amendment claim of ineffective assistance of counsel must prove that his attorney's performance "fell below an objective standard of reasonableness" under all the circumstances, *Strickland*, 466 U.S. at 687–88, and that the deficient performance prejudiced his defense, *id.* at 692. To prove prejudice, the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. As applied in the context of plea bargaining, the *Strickland* prejudice inquiry requires the defendant to prove a reasonable probability that (1) he would have accepted the plea offer and pleaded guilty but for counsel's deficient performance; (2) his guilty plea "would have been entered without the prosecution canceling it or the trial court refusing to accept it"; and (3) the end result "would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Frye*, 566 U.S. at 147.

Connor's claim fails at the first step of the *Frye* prejudice framework under the habeas statute's highly deferential standard of review for factual findings in general and credibility determinations in particular. Connor claimed in his testimony at the postconviction hearing that he would have accepted the 18-year plea offer and pleaded guilty had his counsel advised him of the mandatory life sentence he faced if convicted of assaulting both victims. But that testimony

squarely contradicted what he said at the sentencing hearing when he professed his innocence and declared unequivocally that he would *not* have pleaded guilty just to get a lesser sentence *even if* he had known the outcome of trial. Based on that glaring contradiction, and for additional reasons relating to his demeanor and other conflicts between his testimony and the record, the state trial judge found him to be "not a credible witness."

The Illinois Appellate Court affirmed, largely on the same reasoning. That ruling is well supported by the record. It is also presumptively correct under § 2254(e)(1), and Connor bears the burden of rebutting the presumption by clear and convincing evidence. His argument for overturning the state court's credibility finding rests solely on the significant disparity between the 18-year plea offer and the mandatory life sentence he faced if convicted at trial (and is now serving). He contends that the significance of this disparity is enough, without more, to rebut the adverse credibility determination.

It's true that a sizable disparity between the sentence called for in a putative plea bargain and the sentence the defendant faced if convicted at trial is objective evidence that can inform the *Strickland* prejudice question in this context— i.e., whether the defendant would have pleaded guilty but for his attorney's errant advice. *See, e.g.*, *Julian v. Bartley*, 495 F.3d 487, 498–99 (7th Cir. 2007); *Moore v. Bryant*, 348 F.3d 238, 242–43 (7th Cir. 2003). But it's not enough on its own. We've explained that a defendant must do more than "show that *most* or *many* defendants in his position would accept the plea." *Quintana v. Chandler*, 723 F.3d 849, 857 (7th Cir. 2013). Rather, to prove that he was prejudiced by counsel's performance at the plea-bargaining stage, the defendant "must offer

something more than the large gap in sentence lengths to show that *he* would have accepted the [plea deal]." *Id.*

Applying this principle here, the large gap in sentence lengths is not enough to displace the state court's adverse credibility finding. It shows, at best, that many defendants in Connor's position would accept the plea deal; it does *not* clearly and convincingly show that *he* would have done so. In more concrete terms, it does not show that he would have pleaded guilty to sexually assaulting his daughter or step-daughter—especially (though not exclusively) because he said precisely the opposite at sentencing when he was well aware that he was about to be sentenced to life in prison.

On this record, the sentence disparity is not alone enough to overcome the presumption of correctness that applies to state-court factual findings. More specifically, it does not overcome the great deference owed to state-court credibility determinations on federal habeas review. The state appellate court affirmed the trial judge's rejection of Connor's postconviction testimony as not worthy of belief, a finding that is amply supported by the record. Connor had a heavy burden to clearly and convincingly rebut this adverse credibility finding. He has not carried it.

AFFIRMED

Rovner, *Circuit Judge, concurring*. Michael J. Connor rejected a plea offer of eighteen years, thinking it was possible that he might be sentenced to as little as twelve years. At the time he was considering the plea offer, neither his counsel nor the court informed him that, should he be convicted, the court would have no choice but to sentence him to 120 years. This is an astoundingly troubling fact scenario. Nevertheless, the majority's careful analysis correctly concludes that our hands are tied. The state post-conviction relief court made factual and credibility findings to which we must give great deference, and those determinations make federal habeas relief from this state conviction impossible.

I write only to highlight two issues I believe to be worthy of consideration in future cases. First, the defense bar may wish to consider whether lawyers have a duty to advise their clients about the potential consequences of making allocution statements like the one Connor made here—that he would have never accepted a plea deal under any circumstances. After all, it is not an uncommon scenario for a defendant to allege in post-conviction proceedings that he was misinformed about his maximum potential sentence. A defendant can continue to profess vociferously his innocence without stating that there are no circumstances under which he would have accepted a plea. A person may think he would never plead guilty to a crime he did not commit, but many of us would feel differently when confronted with the risk of spending the rest of our lives in prison. "Never say 'never'" would have been sage advice from counsel.

Second, allocution is an important right that allows a defendant to present mitigating circumstances and represent himself to a judge in the most favorable light. *United States v.*

*Cunningham*, 883 F.3d 690, 699 (7th Cir. 2018); *see also* Kimberly A. Thomas, Beyond Mitigation: Towards A Theory of Allocution, 75 Fordham L. Rev. 2641, 2644 (2007). One might expect defendants to do all they possibly can to paint themselves in the best light. Because the purpose of these unsworn statements is to persuade, present mitigating circumstances, and seek mercy, courts ought to think skeptically about the use of these statements as substantive evidence in subsequent proceedings. *But see U.S. v. Ward*, 732 F.3d 175, 183 (3d Cir. 2013) (noting that the unsworn nature of allocution does not prevent its use in future proceedings); *United States v. Whitten*, 610 F.3d 168, 199 (2d Cir. 2010) (same). The use of Connor's allocution statement in this case is particularly troubling because it was not a confession to a particular crime or fact, but a statement meant to convey how strongly he believed in his innocence.

Moreover, contrary to the state post-conviction court's conclusion, I am not so certain that, at the time he delivered his allocution statement, Connor understood that the court had absolutely no choice but to impose a mandatory life sentence. Just before Connor made his statement, his counsel addressed the court and offered a theory for imposing a mere twelve-year sentence. If, in fact, his counsel thought that a twelve-year term of imprisonment might still be on the table, it seems likely that Connor could have as well. In order to demonstrate the sincerity of his claim of innocence, Connor may have been willing to risk twelve years, but as we have now noted many times, the calculus must surely change when a court has only one choice of sentence—life imprisonment.

At the moment in time when Connor had to make his decision to accept or reject the eighteen-year plea offer, he was

devastatingly ill-informed of the potential ramifications of rejecting the offer. I question the fairness of locking Connor into his statement at allocution that he would not have changed his plea had he known that he would be found guilty, given the disparity between the 18-year plea offer and the eleventh-hour discovery that he was subject to a mandatory life sentence. Nevertheless, the state post-conviction relief court did not believe Connor's later contention that he would indeed have accepted the 18-year offer. As the majority correctly and fairly concludes, we have no ability to undo the state court's credibility and factual determinations. This court is left with no choice but to deny the requested relief.